2023 IL App (4th) 220717

NO. 4-22-0717

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| WONNE FISHER, | ) | No. 19CF588 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1       Following a jury trial, defendant, Wonne Fisher, was found guilty of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)). The trial court sentenced defendant to imprisonment for 12 years and 6 months. Defendant appeals, arguing that he was denied a fair and impartial sentencing hearing because the court was biased against him, considered improper aggravating factors, and failed to consider pertinent mitigating factors. We vacate the sentence and remand for a new sentencing hearing before a different judge.

¶ 2                               I. BACKGROUND

¶ 3       In September 2019, the State charged defendant with aggravated criminal sexual abuse, alleging that defendant knowingly committed an act of sexual penetration with D.B. The State further alleged that, at the time the act was committed, D.B. was at least 13 years of age but under 17 years of age, and defendant was at least 5 years older than D.B.

¶ 4          Defendant's jury trial commenced in December 2019. The State first called D.B., who testified to the following. D.B. lived with her mother, Danielle C., who is blind, at an apartment complex in Peoria. When D.B. was 13 years old, defendant sent her a friend request on social media, which D.B. accepted. Defendant started texting D.B., asking to meet and talking about sex. D.B. "brushed him off" because she did not know defendant. D.B. testified that in December 2016, she briefly encountered defendant in person for the first time at the back door of her apartment building. At that time, D.B. told defendant her age, which was 15. Thereafter, defendant and D.B. continued texting. D.B. told defendant that she was 15 on several occasions. Defendant told D.B. that he was 20 years old. D.B. saw defendant at the apartment complex "all of the time" and "bumped into" him "a few times," but she was unsure if defendant lived there.

¶ 5          D.B. testified that on January 15, 2017, defendant came to her apartment while Danielle was away, and she and defendant had sex for the first time. On January 26, 2017, D.B. and her family had a party at a hotel for D.B.'s fifteenth birthday, which had occurred several months prior. According to D.B., Danielle's caretaker, Dedrick Eckwood, invited defendant to the party because "they're supposedly related." D.B. explained that she and defendant had sex in her hotel room that night and again the following day. D.B. testified that they had sex again in February 2017. D.B. asserted that they did not use protection on any of these occasions. D.B. denied that she told defendant she was 18 years of age.

¶ 6          According to D.B., she later learned that she was pregnant and "knew" defendant was the father because he was the only person with whom she had sex. After D.B. informed her mother, D.B. spoke with the police. D.B. provided a deoxyribonucleic acid (DNA) sample for testing and allowed the police to obtain a DNA sample from her child after the child's birth.

¶ 7        Danielle testified that she is D.B.'s mother. Danielle noted that she is legally blind, explaining that while she can see some things in her left eye, she is completely blind in her right eye. According to Danielle, Eckwood acted as her caretaker, but they eventually developed a romantic relationship. Danielle testified that Eckwood was familiar with defendant, and defendant would sometimes come to her apartment. Prior to January 15, 2017, Danielle had a conversation with defendant in which she told him that D.B. was "only 15, and she had just had a birthday." Defendant responded that he was 21 years old. Danielle testified that in January 2017, she rented two rooms at a hotel to celebrate D.B.'s birthday, which had occurred in November 2016. Danielle, D.B., Eckwood, and defendant attended. Everyone was "back and forth" between the rooms because there was pizza and cake. Danielle and Eckwood were to spend the night in one of the rooms, and D.B. and her two brothers were to spend the night in the other room, but D.B.'s brothers did not attend. According to Danielle, everyone knew that they were celebrating D.B.'s fifteenth birthday, and Danielle told defendant that D.B. was 15 several times. Danielle testified that in the summer of 2017, she noticed some weight gain in D.B. Danielle asked D.B. if she was "still a virgin," and D.B. responded that she was not. They went to the hospital, where they learned D.B. was pregnant. Danielle explained that she later learned that defendant had sex with D.B. and that defendant was in his thirties.

¶ 8        Jason Leigh testified to the following. Leigh was an officer with the City of Peoria Police Department in the juvenile detective division. After learning of D.B.'s pregnancy, Leigh spoke with D.B. and Danielle at the police station on July 12, 2017. D.B. informed Leigh that she was pregnant by defendant. Leigh knew defendant's date of birth to be February 16, 1986, and that defendant was 31 years of age. On July 13, 2017, Leigh spoke with defendant. Leigh testified that defendant denied having any physical contact with D.B. Defendant told Leigh that he only talked

with D.B. over Facebook and that D.B. told him she was 18. According to Leigh, defendant acknowledged that he eventually learned D.B. was 15 or 16 in December 2016 or January 2017. Leigh testified that he collected DNA samples from defendant, D.B., and D.B.'s child and submitted the samples for paternity testing. Leigh testified that, after the result of the paternity test was returned, defendant was arrested.

¶ 9 The parties stipulated that the result of the paternity test showed that the probability that defendant was the father of D.B.'s child was 99.999%.

¶ 10 Defendant testified that he first encountered D.B. when D.B. sent him a friend request on Facebook. According to defendant, he and D.B. started messaging each other. Defendant believed D.B. was 18 years old because she purported to be that age on her Facebook profile and in messages she sent to defendant. Defendant testified that he moved to the apartment complex where D.B. lived in November 2016 or December 2016 and that he met D.B. in person for the first time about a month later. Defendant explained that Eckwood, who was his cousin, was dating Danielle. According to defendant, he attended D.B.'s birthday event in January 2017 because Eckwood invited him and told him that D.B. wanted him there. Defendant testified that Danielle rented two hotel rooms for the event, and he believed one room was for Danielle and Eckwood while the other was for D.B. and defendant. Defendant admitted that he had intercourse with D.B. at that time, but he claimed that he believed D.B. was 18 years of age because (1) D.B. did not look or act young and (2) Danielle drank and smoked with D.B. Defendant testified that, after Danielle learned that D.B. was pregnant, Danielle called him, "cussed [him] out," and told him that D.B. "is only 15." Danielle then called the police. Defendant admitted that, when questioned by Leigh, he stated that he did not have intercourse with D.B., because he did not want

- 4 -

to get in trouble. Defendant maintained that he thought D.B. was 18 years of age, that he had sex with D.B. only once, and that he did not have sex with D.B. after learning that she was 15.

¶ 11　　　　The jury found defendant guilty of aggravated criminal sexual abuse. Prior to sentencing, a presentence investigation report (PSI) and sex offender evaluation were completed. The PSI indicated the following. In September 2019 and October 2019, while defendant was in jail, defendant was involved in several altercations with jail staff and other inmates. Specifically, on September 24, 2019, defendant became verbally aggressive with nursing staff and correctional officers. On October 1, 2019, defendant refused to follow instructions to close his cell door and threatened to break a correctional officer's jaw. On October 11, 2019, defendant engaged in a physical altercation with another inmate. Finally, on October 30, 2019, defendant engaged in a verbal argument with another inmate. Defendant reported that the highest grade he completed in school was the eighth grade and that he participated in special education classes. Defendant never obtained his general equivalency diploma. According to defendant, he had been diagnosed with bipolar 1 disorder, post-traumatic stress disorder, paranoid-schizophrenia, and major depressive disorder. Defendant relayed that he was expelled from school due to behavioral issues. Defendant explained that he was in the custody of the Illinois Department of Children and Family Services from the age of 2 until he was 20 or 21 years of age and lived in several placements throughout that time. Defendant reported experiencing sexual abuse by a foster brother and physical abuse by a foster mother. Defendant reported that he fathered 16 children by several women and could provide the names of only 7 of the children. Defendant noted that he began to experience symptoms of mental illness when he was a child and that he had several hospitalizations as a result, including one in August 2019 after he was noncompliant with his psychotropic medications.

¶ 12        The sex offender evaluation also referred to defendant's mental health issues and defendant's claim that he had 16 biological children but could not remember all their names. Defendant reported that the highest grade he completed in school was eighth grade and that he was in special education classes for all subjects. Defendant explained that he was held back in the eighth and ninth grades and that he did not go back to school to complete the ninth grade. Defendant reported wanting to go "to the mental hospital" to prevent his going back to jail again. He hoped that it would be "just a temporary hospitalization" because he wanted to get a job to "pay the bill for my mom's ashes or obituary." The sex offender evaluator, Dr. Michael Shear, indicated that defendant's "mental health problems should be considered" and recommended that "therapeutic intervention" should be emphasized "over punitive approaches." Accordingly, Dr. Shear recommended "[i]ntensive probation" after "some more (albeit relatively short-lived if at all) incarceration."

¶ 13        A sentencing hearing was initially set for January 22, 2020. At the hearing, the trial court explained that it needed additional time to review the sex offender evaluation but made the following comments about what it had reviewed up to that point:

> "[Defendant] was arrested on September 19th of 2019. *** On September 24th—he was there a whole five days—he became verbally aggressive with the Peoria County Jail nursing staff ***.
>
> On October the 1st, the defendant *** was disrespectful toward a correctional officer *** because the defendant would not follow the instructions of closing his cell door. Ooh, such an obligation. ***
>
> So the first set of mouthiness occurred five days after he was there. The second set occurred 13 days later, after he was there, and then went on and on. Why

do I say this? Because we had a jury trial because the defendant's allowed to have one; and by God, he wanted one; and that's what he got. So everybody did what the defendant wanted.

'Don't want to close the door. Want to call people names. ***'

Blah, blah, blah. Oh. By the way, a child is born to this romantic interlude."

The court made the following additional statements about the sex offender evaluation:

"[J]ust to pick out some of the good parts ***. Page 2 starts this way.

'The client was a 33-year-old African American. Single. Never married. Male. *** He believed that he had a total of 16 biological children, but he was not entirely certain.'

Oh, boy. ***

***. On page 3 it says, quoting the defendant—because this apparently is the important part of his life. Remember, we're here because he demanded his jury trial in his denial of having a sexual relationship with a minor, who is here. But on page 3 of his evaluation, this is what leaped to the top of his important parts of life.

'I want to go straight to the mental hospital after I get out to help prevent me from getting in trouble and going back to jail again from not being on meds. I'm hoping it's just a temporary hospitalization, though. I haven't been able to pay the bill for my mom's ashes or her obituary, so I want to get a job and make some money to pay for that. *** '

What's important in your life here, [defendant]?

'I want—did I tell you I didn't pay for my mom's ashes or her obituary? I got to that—I got to get that stuff paid for. By the way, I have 16 children and I've

fathered another one. I've never been married, and I've'—all right. *** I am not in a position to sentence you today when I'm learning today that you have 16 previous children, maybe. You lost count. And that your priority in life is getting your—the obituary paid to the Journal Star for your mother's obituary and some ashes. And meanwhile, there's a 2-year-old child, I think—number—we'll just call her 'Number 16,' that's romantic—in the batter's box."

Thereafter, the court set defendant's sentencing for February 26, 2020.

¶ 14      At sentencing, defendant testified that he planned to get a job to support his children financially and emotionally. Defendant explained that he interacted with the seven children he acknowledged were his at their homes and through Facebook Messenger. Defendant granted that there were nine other children he had not parented because he was uncertain whether he was the father. Defendant testified that he had no incidents since he began taking his medication consistently. The trial court stated that the PSI outlined defendant's contact with the criminal justice system. The court then commented that it could not "overlook the notion that in just 2019 a petition was filed to acquire a stalking/no contact order," which was granted. The court asked if defendant's counsel intended to "ask him about that," noting that it took "the liberty of bringing the file up and reading it." The court then questioned defendant. In response to the court's questions, defendant explained that an order of protection was entered against him after someone "tried to say that I basically had took a TV out of his house." The court then asked defendant about his relationship with his children, commenting, "Watch this. [Defendant], the nine children that are mentioned that you didn't have any attachment with, did you ever meet them?" The court also asked defendant about his employment history, and defendant testified that he moved from Peoria to Chicago to "work[ ] a job out there" in June 2019, around the time his mother died. Defendant

explained that he chose to work in Chicago because his mother wanted her ashes spread there. During defendant's explanation, the court commented that talking to defendant was "kind of like talking to a dictionary that doesn't use the alphabet."

¶ 15        The State requested a sentence of imprisonment in the extended-term range of 7 to 14 years. Defendant's counsel requested a term of probation, per the recommendation in the sex offender evaluation. The trial court responded that the experts have "got to be off their rocker" and that "[s]omebody needs to review them." The court also asked, "[s]o that's what the sex offender evaluation thing is supposed to be? It's supposed to include what they think in their role as the judge that the defendant should be given after their finger to the wind?" The court continued, "[s]o this is their thought of what they think the criminal sentence should be for this defendant? Well, good for you, Dr. Shear."

¶ 16        Before allowing defendant to speak on his behalf, the trial court addressed defendant:

"Let me mention this to you if you do wish to say something, here's something in my head that's hard to overcome. I think you're bad for the Earth, because we're sitting here talking about [D.B.] and [D.B.'s child] and this, and then the nerve of you wanting to parent this new child, the nerve of it all.

What is the Earth doing, sir, with the nine children and the seven children and these other children that you aren't parenting at all? And now you want out to make some more. How do I reconcile sentencing you when I read in your presentence report this? 'I have a baby out of the situation, so it's good. I see the baby as a blessing.'

Is that how you see the other 16 as well?

'Basically, she lied to me about her age. She was 15, and I was 29. We had sex one time.' Blah, blah, blah.

What about the Earth? Children that they [*sic*] don't have you as a father, they don't have any father, but you continue making them. How do you reconcile that? What are you going to do that's different if you were to be out than now?"

Defendant responded that, following a psychiatric evaluation, he would be on the "proper medication," and he would be able to "take the classes I need to as a single father" to be a part of his children's lives. Defendant explained that, while he was remorseful about the situation, he viewed any child of his to be a blessing. The court countered, "and you let it go." Defendant responded that he did not "let it go" but had struggles and problems that he "ran into." Defendant then attempted to explain his move to Chicago and his employment there after his mother passed away when the court interrupted, stating, "Oh, stop that moved to Chicago stuff. Stop it."

¶ 17    The trial court then announced that it considered all relevant matters in aggravation and mitigation as well as the history of defendant, then made the following remarks.

"I find as follows. [Defendant] is bad for the Earth. He is a child making machine. He is on autopilot, and the autopilot is fast. My goodness. ***

In a word, stunning. Stunning. Sixteen children. Nine, don't know their names. Not sure they're mine. Every baby is a blessing. I don't see it that way. If that was the case, we would line up test tube after test tube. Eggs to the left. Sperm to the right. Combine them. Bing. Out comes baby, blessing number one. That's not how I see it.

But that's how you're doing it. You are smothering the Earth, sir, and you stepped over the line big time with [D.B.]"

As to the sex offender evaluation and its recommendation of probation, the court asked, "what planet is [Dr. Shear] living on that he thinks these are recommendations for earthlings?" The court continued, "Maybe Dr. Shear—who I'll refer to as Mr. Shear, Michael, the person who typed this up—maybe thinks that these are his parameters. First of all, so-what department, who-cares division *** that you think intensive probation is appropriate." The court then stated:

> "This is one of the more egregious life conduct behaviors I have seen. We have shown [defendant] the door, put some clothes on him, pointed him to the North Star, and said, 'There's the world. Go populate it.' And that's what he's done. My goodness."

¶ 18　　The trial court sentenced defendant to 13 years and 6 months' imprisonment with 2 years of mandatory supervised release and ordered defendant to register as a sex offender.

¶ 19　　Defendant's counsel subsequently filed a motion for reconsideration of sentence. At the hearing on the motion, the trial court acknowledged that it had made "extraneous remarks which were probably stream of consciousness ***. I was alarmed at the number of children that the defendant produced from I don't remember how many different mothers." The court stated, "I don't believe I indicated that I wanted to keep [defendant] from having children. Although, I think he certainly has become a stellar producer. But I think that the Court can take into account the number of children he's produced." The court further noted that it did not believe it articulated at sentencing that defendant was being "locked away so as to not be able to have some sort of procreation opportunity." The court nevertheless granted the motion for reconsideration.

¶ 20　　A second sentencing hearing occurred on July 13, 2022. At the hearing, the State again asked for a sentence "near the maximum." Defendant's counsel argued that defendant "had a horrible childhood experience being sexually abused himself, bouncing around from foster home

to foster home, physical abuse, sexual abuse." Counsel asserted that defendant had mental health issues and that therapeutic intervention should be emphasized over punitive approaches. Thus, counsel asked for a six-year sentence of imprisonment. Defendant, speaking on his own behalf, explained that the "issues" he experienced while in jail were due to his mental health, but after receiving the "right medication," he has caused no problems. Defendant further explained that, following DNA testing, he learned that he fathered 7 children, not 16 as he previously reported.

¶ 21       The trial court stated that it considered all statutory factors in aggravation and mitigation as well as the character and history of the defendant. The court then made the following comments:

> "I had sentenced the defendant one time earlier, and I had spoken thoughts that maybe I should reconsider, and I do, and I would replace them with these observations. I can't un-bake the pie and un-share my thoughts, but I will be able to temper them and provide them this way."

The court then described defendant's conduct as "stunning." The court did not credit defendant's claim that he fathered only seven children, because defendant presented no substantiating DNA evidence. As to the sex offender evaluation, the court stated, "[w]hat planet is that man [(Dr. Shear)] living on to come up with these conclusions[?]" "[T]he conclusions that Dr. Shear reaches are somewhere between the planet Zircon and the planet yet undiscovered." The court reiterated that defendant reported having 16 children and that he was unable to remember all their names. The court also remarked that defendant was found guilty by 12 citizens, which was "less than the number of children that the defendant has fathered." The court explained that it received a letter from D.B. (which does not appear in the record), in which D.B. (1) asserted that having a child has made her a more loving person and (2) asked for defendant to be sentenced only to probation so

that her child could grow up with a father. The court stated that D.B. was "walking on this dark cloud where she says, 'I love being a mother. I love my child.' " While the court acknowledged that defendant's childhood "was miserable," the court questioned what that "mean[t] to society," stating:

> "Do I tell [defendant] to wear a sign around his neck that says, 'Hey out of my way. I'm a-coming through and I got a bad childhood, so just giving you the little thumbs up. I've got the red light on my head. Honk honk. Peel off to the side. [Defendant] coming through. Pants down.'
>
> Terrible childhood, [defendant], and I regret that it happened to you, but I didn't do it to you, and neither did [D.B.]"

¶ 22 The trial court concluded its remarks by noting that this was a simple case in which defendant had sex with a minor resulting in a pregnancy. Following the pregnancy, defendant "denie[d] it until the DNA sa[id], 'Nope, bring in Maury Povich. You are the father,' " and "now a child will be on the earth because of it." The court sentenced defendant to imprisonment for 12 years and 6 months, mandatory supervised release, and registration as a sex offender.

¶ 23 This appeal follows.

¶ 24 II. ANALYSIS

¶ 25 Defendant argues that he was denied a fair and impartial sentencing hearing because the trial court was hostile toward him and considered improper aggravating factors while failing to consider pertinent mitigating factors. The State responds that the court remained impartial, and any error that occurred during the first sentencing hearing was cured by the second.

¶ 26 Initially, we note that defendant's argument is not preserved because defendant raised no contemporaneous objection at sentencing. See *People v. Hillier*, 237 Ill. 2d 539, 544-45

(2010) (stating to preserve a claim of sentencing error, counsel must make both a contemporaneous objection and a written postsentencing motion raising the issue). Defendant argues that we should relax the forfeiture doctrine pursuant to *People v. Sprinkle*, 27 Ill. 2d 398 (1963), and consider his claim as if it were properly preserved. Defendant alternatively argues that we should consider his argument under the second prong of the plain-error doctrine.

¶ 27         In *Sprinkle*, our supreme court determined that judicial misconduct could provide a basis for relaxing the forfeiture rule. *Sprinkle*, 27 Ill. 2d at 400-01. In *Sprinkle*, the trial court posed questions to witnesses in front of the jury during the defendant's trial that revealed the court's own opinions of the case and witnesses, but the defendant's counsel did not object. *Sprinkle*, 27 Ill. 2d at 400-02. The supreme court nevertheless reviewed the defendant's claim that he was deprived of a fair trial. *Sprinkle*, 27 Ill. 2d at 400-01. The court explained that juries may view trial judges as more knowledgeable than the attorneys about the law. *Sprinkle*, 27 Ill. 2d at 400. As a result, when a lawyer objects to comments or questions by a judge in front of a jury, the attorney may harm his or her client's interests by causing the jury to view the attorney with suspicion or skepticism. *Sprinkle*, 27 Ill. 2d at 400. The court determined that, because the attorney would be faced with risking harm to his or her client's interest or forfeiting the claim, a "less rigid application" of the forfeiture rule would be appropriate where the basis for the objection is the conduct of the trial judge. *Sprinkle*, 27 Ill. 2d at 401.

¶ 28         Defendant acknowledges that *Sprinkle* involved the conduct of a trial judge in the presence of a jury. Defendant nevertheless argues that the supreme court, in *People v. McLaurin*, 235 Ill. 2d 478 (2009), recognized that *Sprinkle*'s holding has been applied in "some extraordinary circumstances" when an objection " 'would have fallen on deaf ears.' " *McLaurin*, 235 Ill. 2d at 487-88 (quoting *People v. Davis*, 378 Ill. App. 3d 1, 10 (2007)). However, defendant disregards

that the court in *McLaurin* refused to apply *Sprinkle* and stressed that counsel has an obligation to object and properly preserve those objections for review. *McLaurin*, 235 Ill. 2d at 488-89. The court explained that the "extraordinary circumstances" to which it referred included "when a trial judge makes inappropriate remarks to a jury" or "relies on social commentary, rather than evidence, in sentencing a defendant to death." *McLaurin*, 235 Ill. 2d at 488. Additionally, the court explained that it has "seldom applied *Sprinkle* to noncapital cases," which further underscored "the importance of uniform application of the forfeiture rule except in the most compelling of situations." *McLaurin*, 235 Ill. 2d at 488. Here, the error alleged by defendant concerns neither inappropriate remarks made in front of a jury nor the reliance on social commentary in sentencing a defendant to death. Defendant provides no authority to establish that the trial court's comments in this case are the type of "extraordinary circumstance" to warrant application of *Sprinkle*. Accordingly, we decline to apply *Sprinkle*. Defendant, therefore, must seek recourse through the plain-error doctrine.

¶ 29     To establish plain error in the sentencing context, a defendant must first show that a clear or obvious error occurred. *Hillier*, 237 Ill. 2d at 545. Then, the defendant must show that (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545.

¶ 30     A trial court must conduct itself in a fair and impartial manner, and the court may not show bias or prejudice against either party. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115. Judicial restraint in the court's conduct and remarks is not limited to the presence of the jury but is required throughout all the court's dealings with the litigants who come before it. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 80. "A sentencing hearing is fundamentally unfair—and due process is denied—when the proceeding is affected by judicial bias." *People v. Rademacher*,

2016 IL App (3d) 130881, ¶ 47. This is so regardless of whether the ultimate sentence imposed was within the statutory limits. *Rademacher*, 2016 IL App (3d) 130881, ¶ 47.

¶ 31    A trial judge is presumed to be impartial, and it is the burden of the party challenging the court's impartiality to overcome that presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. We view allegations of judicial bias or prejudice in context and evaluate the allegations in terms of the trial judge's specific reaction to the events taking place. *Romero*, 2018 IL App (1st) 143132, ¶ 96. To show bias, a defendant must "demonstrate that the judge displayed 'active personal animosity, hostility, ill will, or distrust toward the defendant.' " *Romero*, 2018 IL App (1st) 143132, ¶ 96 (quoting *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010)). Judges must be fair and dispassionate arbitrators above all else. *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997). Thus, any showing of bias against a party constitutes reversible error. *Phuong*, 287 Ill. App. 3d at 994. Whether the trial judge's conduct requires reversal is reviewed *de novo*. *Romero*, 2018 IL App (1st) 143132, ¶ 96.

¶ 32    We find *Phuong* and *People v. Montgomery*, 2023 IL App (3d) 200389, instructive. In *Phuong*, the defendant, who spoke Chinese and had recently immigrated to the United States, was charged with retail theft. *Phuong*, 287 Ill. App. 3d at 990. The defendant opted to testify at her bench trial, and her counsel asked the trial court if the defendant could testify through a Chinese interpreter. *Phuong*, 287 Ill. App. 3d at 992. The court responded, " 'Miss Public Defender, we're going to be here until the [F]ourth of July.' " *Phuong*, 287 Ill. App. 3d at 992. Later, when the defendant shook her head in response to a question, the court stated, " 'She's shaking her head in Chinese, no.' " *Phuong*, 287 Ill. App. 3d at 992. When the defendant was asked if any employee at the store spoke with her, the court interjected, " 'Nobody speaks Chinese that I know of except this lady. So, the policeman doesn't talk to her in Chinese and neither does anybody from [the

store]. So what?' " *Phuong*, 287 Ill. App. 3d at 992-93. The court ultimately found defendant guilty of retail theft, stating, " 'There's no question in my mind as to the guilt of the defendant with or without English.' " *Phuong*, 287 Ill. App. 3d at 993.

¶ 33　　　　The defendant appealed, arguing that the trial court was biased and deprived her of a fair trial. *Phuong*, 287 Ill. App. 3d at 990, 993. The appellate court agreed, concluding that the trial court's "remarks, taken together, establish the trial court's prejudice against defendant." *Phuong*, 287 Ill. App. 3d at 994. The appellate court explained that, because judges must be fair and dispassionate arbitrators, any showing of bias against a party constitutes reversible error. *Phuong*, 287 Ill. App. 3d at 994. The court noted that the fact that the trial court "was giving voice to his impatience and sarcasm is enough to show prejudice." *Phuong*, 287 Ill. App. 3d at 995. The court held that, "[b]ased on the numerous insulting remarks made by the trial court against defendant, we cannot be sure that defendant received a fair trial." *Phuong*, 287 Ill. App. 3d at 995. Accordingly, the appellate court concluded that the trial court committed second-prong plain error. *Phuong*, 287 Ill. App. 3d at 993.

¶ 34　　　　In *Montgomery*, the appellate court reviewed comments the same trial court judge in this case made to the defendant at sentencing. *Montgomery*, 2023 IL App (3d) 200389, ¶¶ 11-12. The defendant pleaded guilty to aggravated battery after attacking the victim in a convenience store. *Montgomery*, 2023 IL App (3d) 200389, ¶ 6. At sentencing, the court watched (1) surveillance video from the store depicting the attack and (2) police body camera footage of defendant's arrest. *Montgomery*, 2023 IL App (3d) 200389, ¶ 10. The court then made several comments to the defendant, including the following. The court stated that it was surprised the convenience store clerk " 'didn't shoot' " defendant during the attack and that " 'I would have killed you. I would not have waited for the police.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12.

The court also mimicked an expletive-laden rant the defendant made about his phone during his arrest, then told the defendant, " 'It's all about your f*** phone.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12. The court opined that any of the defendant's family members who saw the attack and came to the defendant's defense " 'should be ashamed of themselves.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12. Thereafter, the court described the defendant's conduct as " 'pitiful,' " noting that if the court saw defendant's behavior " 'at a bar ***, I would roll my eyes and think, oh, when is this liquid courage marathon going to get over with.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12. After describing the victim as a " 'little old man,' " the court commented, " '[t]hat could have been my dad.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12. Additionally, the court stated that if anyone came " 'to a place where I'm at and should be safe and forces themselves on me and a gun is nearby, they will be leaving not in an ambulance but in a hearse.' " *Montgomery*, 2023 IL App (3d) 200389, ¶ 12.

¶ 35    The defendant appealed, arguing that his sentencing hearing was unfair because the trial court was biased, and the appellate court agreed. *Montgomery*, 2023 IL App (3d) 200389, ¶¶ 27, 32. The appellate court determined that the trial court's "alarming" remarks demonstrated the court's animus toward the defendant and "traverse[d] the bounds of due process." *Montgomery*, 2023 IL App (3d) 200389, ¶ 32. The appellate court also explained that the trial court failed to meet the standard of being patient, dignified, and courteous to litigants appearing before it. *Montgomery*, 2023 IL App (3d) 200389, ¶ 32. Accordingly, the appellate court vacated the defendant's sentence and remanded for a new sentencing hearing before a different judge. *Montgomery*, 2023 IL App (3d) 200389, ¶ 33.

¶ 36    Like *Phuong* and *Montgomery*, the record here is replete with derogatory and sarcastic statements made by the trial court against defendant. In its presentencing comments about

defendant's "mouthiness" and behavior in jail following his arrest, the court sarcastically noted, "Ooh, such an obligation," when referring to defendant's failure to close his cell door. The court then appeared to hold defendant's decision to pursue a jury trial against defendant, complaining that "we had a jury trial because the defendant's allowed to have one; and by God, he wanted one; and that's what he got. So everybody did what the defendant wanted." See *People v. Ward*, 113 Ill. 2d 516, 526 (1986) (stating that a court may not penalize a defendant for asserting his right to a jury trial). The court also referred to defendant's time in jail as a "romantic interlude," during which D.B.'s child was born. Thereafter, the court stated it would "pick out some of the good parts" from the sex offender evaluation, read that defendant believed he had 16 children but was uncertain, then interjected, "Oh boy." Then, while criticizing defendant for prioritizing matters related to his mother's death, the court stated, "meanwhile, there's a 2-year-old child, I think— number—we'll just call her 'Number 16,' that's romantic—in the batter's box."

¶ 37      At defendant's initial sentencing, the court commented, "Watch this," before asking defendant about whether he had ever met some of his children. Then, instead of considering defendant's limited intellectual ability as a mitigating sentencing factor (see 730 ILCS 5/5-5-3.1(a)(13) (West 2020)), the court noted that talking to defendant was "kind of like talking to a dictionary that doesn't use the alphabet." At best, this comment mocked defendant; at worst, it established that the court held defendant's limited intellectual ability against him. The court also criticized the sex offender evaluation and the experts who authored it, exclaiming that they were "off their rocker" and that "[s]omebody needs to review them." The court then told defendant that he was "bad for the Earth" and asked, "What is the Earth doing, sir, with the nine children and the seven children and these other children that you aren't parenting at all? And now you want out to make some more." Before announcing its sentence, the court repeated that defendant was "bad for

the Earth" and described defendant as a "child making machine" who was "smothering the Earth." In describing defendant's conduct, the court stated, "We have shown [defendant] the door, put some clothes on him, pointed him to the North Star, and said, 'There's the world. Go populate it.' And that's what he's done. My goodness." In addition to these comments, the court explained that it had *sua sponte* researched a prior no contact order entered against defendant, though the court did not note the case number in which the order was entered or the source from which it obtained its information. See *People v. Holland*, 2023 IL App (4th) 220384, ¶¶ 57-60 (holding that the trial court committed error in *sua sponte* looking up the statute for the defendant's prior out-of-state rape conviction where the record did not establish that the source of the information obtained by the court was of indisputable accuracy).

¶ 38     At the hearing on defendant's motion for reconsideration of sentence, the trial court acknowledged that it made "extraneous remarks." Even so, the court asserted that it was "alarmed at the number of children that the defendant produced" and referred to defendant as a "stellar producer."

¶ 39     At defendant's second sentencing hearing, the trial court again acknowledged that it had previously "spoken thoughts that maybe I should reconsider" and could not "un-bake the pie." Nevertheless, the court made additional sarcastic and disparaging comments. The court wondered "[w]hat planet is that man [(Dr. Shear)] living on to come up with" the conclusions in the sex offender evaluation. The court commented that Dr. Shear's conclusions were "somewhere between the planet Zircon and the planet yet undiscovered." The court should have expressed its disagreement with Dr. Shear's opinions in a more dignified, dispassionate, and restrained manner. See *Johnson*, 2012 IL App (1st) 091730, ¶¶ 73, 81 (determining that the trial court's comment to a witness who had authored a report, " 'And how you can call that a report *** with a straight face,

and how a Cook County Public Defender employee can call that a report is beyond me,' " was an unnecessary comment about author's job performance and not made in a dignified, dispassionate, and restrained manner). The court then explained that the number of jurors who convicted defendant was "less than the number of children that the defendant has fathered." While the court conceded that defendant's childhood "was miserable," the court wondered whether it should "tell [defendant] to wear a sign around his neck that says, 'Hey out of my way. I'm a-coming through and I got a bad childhood *** Honk honk. Peel off to the side. [Defendant] coming through. Pants down.' " In remarking about defendant's denial that he was the father of D.B.'s child until after a paternity test confirmed that he was, the court stated, " 'Nope, bring in Maury Povich. You are the father.' "

¶ 40     While a trial judge has great latitude in the courtroom, that latitude is not without limit. *Phuong*, 287 Ill. Ap. 3d at 993. A "judge should be patient, dignified, and courteous to litigants, jurors and witnesses, lawyers and others with whom he deals in his official capacity." *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990). Here, the trial court's remarks toward defendant, taken together, constitute a *tour de force* of sarcasm and scorn establishing the trial court's prejudice against defendant. *Phuong*, 287 Ill. App. 3d at 994; *Montgomery*, 2023 IL App (3d) 200389, ¶ 32; see also *People v. Mays*, 188 Ill. App. 3d 974, 982-83 (1989) (stating the trial judge's conduct of slamming down a pencil, heaving a sigh, and making facial gestures in response to defense counsel's question demonstrated that the court "presumed the worst of" and prejudiced the defendant).

¶ 41     We reject the State's argument that any error during the first sentencing hearing was cured by the second. At defendant's second sentencing hearing, even after the trial court acknowledged that it could not "un-bake the pie" from the first hearing, the court made additional

disparaging statements toward defendant. This included describing defendant with his "[p]ants down" and referencing Maury Povich, an outré television personality, in relation to defendant's learning that he was the father of D.B.'s child. Accordingly, the record establishes that the court's bias against defendant continued even through the second sentencing hearing.

¶ 42        We further note that despite the trial court's assertion that it did not believe it ever articulated that defendant was being "locked away so as to not be able to have some sort of procreation opportunity," the record suggests that the court sentenced defendant, at least in part, to prevent him from fathering more children. For example, during the first sentencing hearing, the court criticized defendant for being a "child making machine" who was "smothering the Earth" and who "want[ed] out [of a prison sentence] to make some more" children. Then, before sentencing defendant to imprisonment during the second sentencing hearing, the court highlighted that defendant had 16 children, which was more than the number of jurors who convicted him. At both sentencing hearings, the court perseverated on the number of children defendant had. To the extent that the court sentenced defendant to prevent him from having additional children, that constituted error. See *People v. Negrete*, 258 Ill. App. 3d 27, 31-32 (1994) (reversing the defendant's sentence and remanding for resentencing before a different judge where the trial court sentenced the defendant to imprisonment to prevent her from becoming pregnant).

¶ 43        We do not condone defendant's conduct or trivialize the circumstances of the crime. However, the trial court's conduct was inexcusable. By repeatedly belittling and demeaning defendant, the court utterly failed to adhere to the high standards expected of judges, which require the court to be dignified and to treat litigants fairly. Where, as here, a judge "displays signs of bias against the defendant, the system ceases to function as it properly should, resulting in plain error and requiring reversal." *Phuong*, 287 Ill. App. 3d at 993. Due to the court's bombardment of

sarcastic and disparaging remarks against defendant, defendant did not receive anything approaching a fair sentencing hearing. Accordingly, pursuant to the second prong of the plain-error doctrine, we vacate defendant's sentence and remand for resentencing before a different judge. *Montgomery*, 2023 IL App (3d) 200389, ¶ 33 (vacating sentence and remanding for sentencing before different judge).

¶ 44                                   III. CONCLUSION

¶ 45          For the reasons stated, we vacate the judgment of the trial court and remand for a new sentencing hearing before a different judge.

¶ 46          Vacated and remanded.

*People v. Fisher*, 2023 IL App (4th) 220717

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 19-CF-588; the Hon. Kevin W. Lyons, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Anne C. Fung, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |