2024 IL App (1st) 221225-U

FIFTH DIVISION
MARCH 15, 2024

No. 1-22-1225

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 4426 |
| | ) | |
| DERRICK SMITH, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Justices Mikva and Navarro concurred in the judgment.

ORDER

¶ 1    *Held:* The defendant's conviction is affirmed since the defendant forfeited his claim that the trial court was distracted and the record is silent as to whether an error occurred based on the trial court's decision to perform other tasks during testimony in a bench trial.

¶ 2    On March 29, 2018, the State charged the defendant-appellant, Derrick Smith, by indictment with four counts of first-degree murder for the beating and stabbing death of the victim, Monica Foster. Mr. Smith filed affirmative defenses of self-defense and insanity at the time of the offense. Mr. Smith hired Dr. Henry G. Conroe to evaluate him, and Dr. Conroe found that his

actions were the "product of a brief psychotic disorder," which caused him to lack the mental capacity to appreciate the criminality of his behavior during the incident. The State called Dr. Christofer Cooper to evaluate Mr. Smith, who disagreed and opined substance abuse was a cause. Following a bench trial, the trial court found Mr. Smith guilty of first-degree murder and sentenced him to 38 years' imprisonment. On appeal, Mr. Smith argues that while Dr. Conroe was testifying about his brief psychotic disorder, the trial court was distracted, which denied his due process right to a fair trial. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4      On March 29, 2018, the grand jury indicted Mr. Smith on four counts of first-degree murder for the killing of Monica Foster, which occurred on February 24, 2018. Prior to trial, Mr. Smith filed affirmative defenses of self-defense and insanity at the time of the offense. The trial court ordered Mr. Smith to complete a behavioral clinical examination (BCX) for fitness to stand trial and to determine his sanity during the offense. Subsequently, two separate evaluations from different clinics found Mr. Smith fit to stand trial with medications and determined him "legally sane at the time of the alleged offense."

¶ 5      Mr. Smith hired Dr. Conroe to evaluate him, and Dr. Conroe found that his actions were the "product of a brief psychotic disorder," causing him to lack the substantial capacity to appreciate the criminality of his behavior on February 24, 2018. The State had Mr. Smith evaluated by Dr. Cooper, who rendered a contrary opinion about Mr. Smith's condition at the time of the offense. Dr. Cooper concluded Mr. Smith was legally sane at the time of the offense and experienced an alcohol-induced blackout.

¶ 6    On May 6, 2018, a bench trial commenced. The State called several witnesses who testified to the following events. On February 24, 2018, Chicago Police Department officers responded to a call of a stabbing. Upon arrival, Mr. Smith answered the door, smelling of alcohol, with blood on his face and clothes. Mr. Smith led Officer Nickerson to a first-floor residence where a naked woman from the waist down was lying on the floor. The woman was lying in a pool of blood with trauma to her head. The police asked Mr. Smith, "Who did this," and Mr. Smith responded, "I did." During the State's case-in-chief, Mr. Smith moved for leave to file an insanity defense.

¶ 7    The State elicited testimony that officers observed the victim, Ms. Foster, lying on the living room floor with several large injuries to her head and face, a stab wound in her chest, and a large amount of blood around her head and upper torso. While walking through the apartment, officers observed multiple empty containers of alcohol, a knife stuck vertically in the floorboard, a baton with a dry substance and a bent tip, and a blood spatter on the living room wall. The Chicago Police Department spoke with Mr. Smith's brother, Dax Townsend, who provided a recorded conversation between him and Mr. Smith. A written report of the conversation included Mr. Townsend's statement that Smith "sounded intoxicated [and/or] high."

¶ 8    The autopsy of Ms. Foster found "multiple injuries due to assault, blunt force trauma to the head, neck, torso, and upper extremities, sharp force trauma to the neck, torso, and upper extremities." The medical examiner concluded, to a reasonable degree of medical certainty, that the cause of death was multiple injuries due to assault, and the manner of death was homicide. Evidence collected from the crime scene consisted of fingernail clippings from Ms. Foster's left hand and swabs from Mr. Smith's left ear, right and left hands, as well as a knife and an extendable baton. The stipulation read into evidence by the State stated: (1) Ms. Foster and Mr. Smith's DNA were both possible contributors to Ms. Foster's left fingernail clipping; (2) the DNA analysis of

the blood on Mr. Smith's left ear, right hand, and left hand returned with two contributors being Mr. Smith and Ms. Foster; (3) both of their DNA was found on the baton; and (4) the knife handle, had a mixture of DNA from two contributors, which included Ms. Foster but not Mr. Smith.

¶ 9     After the State rested, Mr. Smith testified. On February 24, 2018, before arriving at Ms. Foster's apartment, Mr. Smith bought a "big" bottle of Zinfandel wine for Ms. Foster and "fuzz balls" and a six-pack of Icehouse beer for himself. Mr. Smith drank six beers over the entire evening and fell asleep on Ms. Foster's sofa around 2:00 a.m. Then, according to him, he woke up from a bright white light with a "beast" or a "demon" attacking him. While he tried to push, kick, and hit the "beast," he heard growling sounds but did not hear Ms. Foster's voice. Mr. Smith remembered waking up face down on the living room floor next to a dead body. He had "no idea" why Ms. Foster was lying on the floor dead. He felt scared, believing the person who attacked him was still in the apartment. He grabbed a corkscrew and his phone to call 911. Mr. Smith denied blacking out and speaking to his brother, Mr. Townsend. He denied sending a photograph of the dead body on February 24, 2018, to his brother.

¶ 10    During the State's cross-examination, Mr. Smith acknowledged having blackout episodes from drinking in the past and an earlier emergency room visit with a blood alcohol content (BAC) of .344. However, he did not admit to fighting and spitting on the medical staff and being chemically restrained. Mr. Smith denied being violent when drinking, denied any mental health treatment or being under the care of a psychologist or psychiatrist, and denied three hospital admissions for alcohol intoxication.

¶ 11    Dr. Conroe testified as an expert for the defense, and the State provided a rebuttal expert witness, Dr. Cooper. Both Dr. Conroe and Dr. Cooper evaluated Mr. Smith's sanity at the time of the offense by reviewing the videos and documents, including: (1) the call between Mr. Smith and

his brother, Mr. Townsend, (2) the 911 call, (3) an officer's body-worn camera footage, (4) the police reports, (5) Mr. Smith's interrogation video, (6) a transcript of the grand jury proceedings, and (7) Mr. Smith's medical records from Cook County, Cermak, Northwestern Memorial, St. Bernard, and Jackson Park Hospitals.

¶ 12    Dr. Conroe testified that, during his examination, Mr. Smith was cooperative and alert but depressed. Mr. Smith provided a "coherent, linear account of what he remembered." According to Mr. Smith, he drank "eight to nine beers, but only three were consumed, with Foster," and he passed out after about six or seven beers. Dr. Conroe testified that the phone conversation between Mr. Smith and his brother showed Mr. Smith was not intoxicated and had no presence of slurred speech. When discussing the picture that Mr. Smith sent to his brother, he said Mr. Smith saw a dark-haired woman and presented as "baffled." Dr. Conroe stated, "[Mr. Smith] knows he killed his little sister, but on the other hand, he had the experience of fighting off a demon or a beast and feeling threatened." During the 911 call, although Mr. Smith could follow directions and provide the address to the operator, he presented as baffled and distressed. Dr. Conroe opined that Mr. Smith suffered a brief psychotic disorder. He testified that a brief psychotic disorder is "someone who has delusions, there are fixed false beliefs, hallucinations, grossly disorganized behavior, or disorganized speech for at least a day but for less than one month. And there can eventually be a full return of a person's functioning prior to this psychotic episode."

¶ 13    Dr. Conroe testified that, on the officer's body cam footage, Mr. Smith cooperated and followed directions. Mr. Smith did not flee the scene nor hide the blood on his face or items inside the home, which showed that Mr. Smith appeared sober. Dr. Conroe testified that the interrogation video showed Mr. Smith walking back and forth on a bench. Dr. Conroe's interpretation of Mr. Smith being able to walk on a bench showed no intoxication but rather presented an "unintended

field sobriety test." Further, he stated the video showed Mr. Smith presenting bizarre behavior. First, Mr. Smith looked at the wall, then rubbed the wall, and started muttering something inaudible. Dr. Conroe stated, "[c]learly, this is someone who's disturbed but can't be accounted for by intoxication."

¶ 14    Dr. Conroe testified about Mr. Smith's four mental health hospitalizations. On August 12, 2017, Mr. Smith was admitted to Northwestern Memorial Hospital (NMH) with a BAC of .344. Mr. Smith was discharged two days later with a diagnosis of acute alcohol intoxication and falling downstairs. The medical records from the visit noted Mr. Smith to be combative with a negative drug screening test and a discharge recommendation to seek mental health and alcohol outpatient treatment. Later in August 2017, Mr. Smith was admitted to Jackson Park Hospital, reporting a BAC of .252 and suicidal ideation. During this admission, Mr. Smith "threatened to burn his house down," "pour paint all over his body," and reported hearing voices telling him to kill himself. He was admitted for five days to the inpatient psychiatric unit to detox from alcohol. At discharge, Mr. Smith was diagnosed with schizoaffective disorder and provided antipsychotic and antidepressant medications. Mr. Smith did not follow up with the medication recommendations.

¶ 15    On February 26, 2018, Mr. Smith was admitted to St. Bernard Hospital. Mr. Smith reported hearing voices telling him "to do bad things to himself and others." The doctors at St. Bernard Hospital found Mr. Smith needed emergency involuntary inpatient admission due to auditory and visual hallucinations, forgetfulness, and suicidal or homicidal ideation. Mr. Smith was transferred to Cermak Hospital for further care. At Cermak Hospital, Mr. Smith was treated for schizophrenia or bipolar disorder. Mr. Smith self-reported that he heard ringing in his ears and saw things walk past him in the corner of his eyes. The doctors at the hospital noted no overt psychotic symptoms. However, Dr. Conroe testified that Mr. Smith's symptoms were indications of a mood disorder,

depression, and an anxiety disorder. Dr. Conroe stated that "individuals with these mental health disorders would not have auditory or visual hallucinations." Dr. Conroe spoke with Mr. Smith at Cermak Hospital. Mr. Smith self-reported having three or four suicide attempts and hearing voices on and off for eight years. Mr. Smith believed that the auditory hallucinations were of family members telling him to do things and was prescribed antidepressant medication.

¶ 16    Dr. Conroe concluded "to a reasonable degree of medical certainty, on February 24, 2018, Mr. Smith lacked substantial capacity to appreciate the criminality of his behavior due to his experiencing a brief psychotic disorder." Mr. Smith was not suffering from an alcohol-induced psychosis, but Dr. Conroe did not deny that Mr. Smith has an alcohol use disorder.

¶ 17    However, the State's rebuttal expert witness, Dr. Cooper, testified that the videos and audio recordings led him to a different conclusion. It was significant to him that Mr. Smith knew he was fighting Ms. Foster and how the fight occurred. Dr. Cooper concluded, from the call between Mr. Smith and his brother, that Mr. Smith referred to the victim as his "little sister," "Monica," showing that he knew that the fight he had was with a woman named "Monica." The call depicts real-time events of attacking Ms. Foster with a knife and fighting her with a stick. The 911 call recorded Mr. Smith reporting that "he engaged in [a serious] fight with the alleged victim and essentially that he killed her." He did not find that Mr. Smith showed any psychotic or bizarre behavior. Dr. Cooper explained that a "brief psychotic disorder is essentially a sudden and short-term display of psychotic symptoms or psychotic behaviors." The symptoms include "hallucinations, perceptual disturbances, delusions, or delusional ideations, severely disorganized behavior, or severely or significantly disorganized speech." However, to diagnosis a brief psychotic disorder, you must rule out the presence of another mental illness such as schizophrenia, a mood disorder like bipolar disorder, or alcohol or drug intoxication. Dr. Cooper further explained that if a person had

encountered a traumatic event such as losing consciousness or going to sleep, then waking up to a traumatic event, that could cause a brief psychotic episode. A brief psychotic disorder is difficult to diagnose when seeing it in real-time and "especially difficult [to diagnose] retrospectively months, weeks, or even years after the incident." However, to diagnose a brief psychotic episode, there needs to be data about the prior mental functioning before the episode and then after the symptoms resolve. The person must be experiencing symptoms for at least one day and it cannot be the result of substance use. Multiple medical records depicted Mr. Smith's use of alcohol and as a result Dr. Cooper could not rule out that his presentation was due to alcohol.

¶ 18    Mr. Smith made an unequivocal admission by his statement saying, "I did," when questioned about Ms. Foster's death. Dr. Cooper further testified that while he was sitting in the police vehicle, he continued to make spontaneous remarks about the incident, including "she attacked me," and he took a "stick" from her and "beat" her with it.

¶ 19    However, Dr. Cooper testified Mr. Smith did not present with any psychotic behavior. Dr. Cooper's review of the interrogation video showed that Mr. Smith asked for food and water. He slept, walked back and forth on a bench, and looked and rubbed a wall. Dr. Cooper could not conclude that Mr. Smith's looking and rubbing a wall indicated delusional symptoms.

¶ 20    Further, Dr. Cooper's observed that the bench appeared to be wide enough for Mr. Smith to sleep, indicating he could easily balance on it. Mr. Smith requested two times to go to the hospital for his physical injuries. Mr. Smith was able to provide a clear response. Then, Mr. Smith changed his request for aid the third time, asking for help for mental health reasons. Dr. Cooper testified that Mr. Smith was learning to change why he needed medical attention, which would get him what he wanted.

¶ 21    During Dr. Cooper's testimony of Mr. Smith's medical records, his focus was on Mr. Smith's drinking behavior. Dr. Cooper testified to Smith's medical history report from his sister, Demaris Arrington. Ms. Arrington reported Mr. Smith's prior hospitalization because of intoxication and having altercations with his girlfriend. Ms. Arrington rejected the notion that Mr. Smith had a history of mental illness nor a history of psychotic symptoms, auditory, and visual hallucinations, delusions, and paranoia. Ms. Arrington provided Dr. Cooper with detailed information about Mr. Smith's substance use, "the defendant reportedly began drinking alcohol at age fourteen and has consumed alcohol heavily ever since." Ms. Arrington knew Mr. Smith drank cases of cheap beer every day until becoming very drunk and sometimes would black out from drinking. On February 24, 2018, Ms. Arrington received a call around 1:00 a.m. from Mr. Smith and Ms. Foster. According to Ms. Arrington, Mr. Smith called to say he was staying on Ms. Foster's couch, and they would visit a party. Ms. Arrington received a second call from Mr. Smith in which he stated, "I think I killed Monica." Dr. Cooper testified that the second call between Ms. Arrington and Mr. Smith was not in the police report, and the police reports were detailed and accurate.

¶ 22    Dr. Cooper further testified to Mr. Smith's employment history. Mr. Smith's employment history showed him consistently employed with two jobs at the time of the offense. Mr. Smith self-reported to Dr. Cooper that he was a certified forklift operator and worked an entire shift on the day of the incident. Dr. Cooper testified that during Mr. Smith's evaluation, Mr. Smith self-reported previous drug consumption, alcohol consumption, a history of alcohol-induced blackouts, and around nine arrests for driving under the influence in three states. Dr. Cooper noted inconsistencies in how Mr. Smith described his substance abuse. For example, Mr. Smith said his last use of crack cocaine was in 2012; however, according to the Jackson Park Hospital records,

Mr. Smith used cocaine in 2015 and 2017. Mr. Smith denied any prior mental health diagnosis or treatment. According to Mr. Smith, on the night of the incident, he drank two beers at his apartment and then two beers at Ms. Foster's apartment. Then, Mr. Smith later indicated he may have had more beers. Mr. Smith provided inconsistent and incongruent responses to different people and was inconsistent in the medical records and other reports. Mr. Smith could not remember calling and sending a photo to Mr. Townsend or fighting with Ms. Foster. Dr. Cooper explained that memory loss and blackout are two different things. "A blackout is memory gaps or gaps in memory for events that occurred while somebody [is] intoxicated. It's alcohol induced blackouts while intoxicated on alcohol. The person still has consciousness and often times engages in behaviors that may not even be of concern." He stated alcohol-induced blackouts were different from losing consciousness by passing out. Mr. Smith self-reported to Dr. Conroe that on the night of the incident, he had a nightmare. Mr. Smith, unable to see what he was fighting, knew he was being attacked. Mr. Smith could not explain why he thought at the time he was fighting a demon as opposed to another creature. In his conversation with Dr. Cooper, he did not bring up fighting a demon. Dr. Cooper found these statements significant in showing that Mr. Smith was not in the "delusional belief" that a demon attacked him. Further, Mr. Smith was unable to describe the demon itself.

¶ 23    Dr. Cooper testified to Mr. Smith's multiple hospital admissions. On February 2, 2017, Mr. Smith was admitted to Jackson Park Hospital by the Chicago Police Department for alcohol intoxication. At that time, Mr. Smith self-reported drinking Vodka once a week and using cocaine and marijuana to treat his chronic right leg pain. Dr. Cooper read the medical record by Dr. Bell, a psychiatrist from Jackson Park Hospital, "[Mr. Smith] drank five-six wine coolers and two beers. He says he drinks like this once a weekend. He is bothered because he cannot find a job and is

living from place to place." The record continued stating when "drinking he has frequent blackouts." Dr. Cooper further read Dr. Bell's medical document, "[t]he problem is he is having a blackout and the alcohol is harming his brain so he really needs to stop drinking. He is not overtly psychotic, suicidal, homicidal, or greatly disabled." Then, six months later, Mr. Smith was admitted to Northwestern Memorial Hospital and diagnosed with alcohol intoxication. According to the medical records, when Mr. Smith is heavily intoxicated with alcohol, he becomes combative, violent, aggressive, and threatening. Mr. Smith was punching and spitting on the staff and was not admitted to the psychiatric unit. Once Mr. Smith was stable and sober, the hospital discharged him. Finally, Dr. Cooper testified to Mr. Smith's toxicology report being negative at St. Bernard Hospital because it was forty-two hours after the incident. The physician at St. Bernard Hospital documented that Mr. Smith self-reported auditory and visual hallucinations and memory problems but was determined to be medically stable.

¶ 24    Dr. Cooper concluded Mr. Smith had a drinking problem but was legally sane at the time of the offense and, instead, experienced an alcohol-induced blackout. Dr. Cooper diagnosed Mr. Smith with alcohol use disorder, stimulant or cocaine use disorder, and cannabis or marijuana use disorder. Dr. Cooper's clinical opinion was that there was "no indication of brief psychotic disorder, and Mr. Smith was legally sane at the time of the alleged offense."

¶ 25    The trial court found Mr. Smith guilty of first-degree murder. Mr. Smith filed a motion to reconsider the trial court's finding, alleging in part, that during the testimony of the defense expert, Dr. Conroe, the trial court diverted its attention to signing papers and looking at a computer screen, only giving full attention during cross-examination by the State.

¶ 26    The court denied Mr. Smith's motion for a new trial at the posttrial hearing. The court said, "There is no witness that I've ever heard I haven't paid attention to. The fact that I do more than

one thing at a time does not detract from what [I am] listening to ever, never." The court further

said that these "ridiculous allegations [are] in hopes of finding some foothold in the Appellate

Court is not the way to practice law in this building. [] "I considered all the defense[s] theories."

On August 8, 2022, the court sentenced Mr. Smith to 38 years' imprisonment. Mr. Smith made an

oral motion to reconsider the sentence, which the trial court denied. On that same day, Mr. Smith

filed his notice of appeal.

¶ 27                                                   ANALYSIS

¶ 28     We note that we have jurisdiction to consider this matter, as Mr. Smith filed a timely

notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017).

¶ 29     Mr. Smith singularly argues that the trial court was inattentive during Dr. Conroe's

testimony. He argues that the trial judge diverted his attention to other matters, including "signing

papers" and "looking at [its] computer screen." Mr. Smith asserts that the court's inattentiveness

during the direct examination of Dr. Conroe denied his due process right to a fair trial. While Mr.

Smith raised the argument in his motion for reconsideration, he failed to object to the trial judge's

multi-tasking during his trial.

¶ 30     To preserve a claim for review, a defendant must object at trial and include the alleged

error in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 612 (2010). In *People v.

Sprinkle*, 27 Ill. 2d 398, 399-400 (1963), our supreme court stated that under certain circumstances

that courts of review may consider an error despite the defendant's failure to make a timely

objection. Under the *Sprinkle* doctrine, the forfeiture rule may be relaxed when a trial judge

oversteps its authority in the jury's presence or when counsel has been effectively prevented from

objecting because it would have "fallen on deaf ears." *Thompson*, 238 Ill. 2d at 613; *see People v.

McLaurin*, 235 Ill. 2d 478, 488 (2009) (same). The defendant's failure to preserve an error will be

excused under the *Sprinkle* doctrine only in extraordinary circumstances, such as the trial court refusing to consider mitigating evidence at the defendant's death penalty hearing, a trial court making inappropriate remarks to a jury, or relying    on social commentary rather than evidence in sentencing a defendant to death. *Thompson*, 238 Ill. 2d at 613. Additionally, judicial restraint in the court's conduct and remarks is not limited to the jury's presence but is required throughout all the court's dealings with the litigants who come before it. *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 30. However, the courts seldom apply Sprinkle to noncapital cases, which further illustrates the importance of uniform application of the forfeiture rule except in the most compelling situations. *Fisher*, 2023 IL App (4th) 220717, ¶ 30.

¶ 31    In this case, Mr. Smith claims that the trial court prejudged his case, based on its lack of attention during Dr. Conroe's testimony. Mr. Smith cites the court's statement from the posttrial hearing: "There is no witness that I've ever heard I haven't paid attention to. The fact that I do more than one thing at a time does not detract from what I'm listening to ever, never." The court went on to state "And so for you all to file these ridiculous allegations in the hopes of finding some foothold in the Appellate Court is not the way to practice law in this building. *** To suggest that I made a conclusion before this case was heard as to what the outcome would be is improper. *** I considered all the defense theories." Mr. Smith references the trial court's response to show that an objection would have been futile and potentially counterproductive.

¶ 32    Despite Mr. Smith assertions, the provided trial court statement does not show that an objection would have been ignored during the trial. The court stated that it listened to the expert witness. The record is silent as to any missteps by the trial court which would show a lack of attention. Mr. Smith's failure to properly raise a claim denied the trial court an opportunity to correct an error if there was one or address concerns during the trial. It is the obligation of trial

counsel to object and properly preserve those objections for later review. *McLaurin*, 235 Ill. 2d at 488. When a defendant fails to object to an error at trial and includes the error in a posttrial motion, he forfeits appellate review of that error. *People v. Johnson*, 238 Ill.2d 478, 484 (2010). The reviewing court will consider only plain error when a defendant has forfeited appellate review of an issue. *Thompson*, 238 Ill.2d at 611. Accordingly, we decline to apply the *Sprinkle* doctrine and determine whether review under the plain-error doctrine is warranted.

¶ 33 The plain-error doctrine bypasses standard forfeiture principles, allowing a court to consider unpreserved claims of error in specific circumstances. *Thompson*, 238 Ill. 2d at 613. Under the plain error doctrine, a reviewing court may consider a forfeited argument when a clear and obvious error occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) that error is so severe that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Thompson*, 238 Ill. 2d at 613. However, the first step under either prong of the plain error doctrine is determining whether a clear or obvious error occurred at trial, and the burden of persuasion rests with the defendant. *Thompson*, 238 Ill. 2d at 613.

¶ 34 We find no error by the trial court. In this case, the transcript of the proceedings reflected the trial court's presence during the direct examination of Dr. Conroe. The court asked the State if it had any objection to the admission of Dr. Conroe as an expert and accepted Dr. Conroe as an expert following *voir dire*. The court responded promptly to the defense counsel's request to publish evidence, promptly interjected when the witness did not understand a question posed by the defense counsel, and without delay, the court approved the defense counsel's request to "have a moment."

¶ 35　　　　Further, Mr. Smith provides no other evidence to show the length of the alleged inattentiveness or specific statements missed by the judge during Dr. Conroe's testimony. Ultimately, the record is silent as to whether the trial court was meaningfully distracted. The trial transcript did not present the court's tone during objections nor any sign of pauses or breaks during the direct examination of Dr. Conroe. The only pauses noted in the trial transcript were by defense counsel, when trying to play the audio recording of the phone call between Mr. Smith and his brother. The transcript does not reflect that the defense counsel requested a sidebar from the court during or even after the direct examination of Dr. Conroe. We cannot presume that the court's posttrial admission to doing other tasks affected the framework of the trial proceedings nor the integrity of the judicial process. Mr. Smith has failed to persuade us that an error occurred. Accordingly, we cannot conclude that a clear or obvious error occurred. Without an error, we cannot find plain error. As a result, we affirm Mr. Smith's conviction for first-degree murder.

¶ 36　　　　　　　　　　　　　　　CONCLUSION

¶ 37　　　　For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 38　　　　Affirmed.