NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230690-U

NO. 4-23-0690

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 17, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ERNEST D. STARKS, | ) | No. 16CF706 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court. Justices Harris and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed as modified, finding (1) the trial court did not abuse its discretion when it denied defendant's request to proceed *pro se*, (2) the court conducted an adequate preliminary *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181 (1984)), (3) defendant forfeited his claim for a substitution of judge for cause, and (4) the court erred when it resentenced defendant to a more severe sentence on remand.

¶ 2    Following a jury trial, defendant, Ernest D. Starks, was found guilty of child pornography (720 ILCS 5/11-20.1(a)(1)(i) (West 2016)) and aggravated criminal sexual assault (*id.* 11-1.30(a)(4)). The trial court sentenced defendant to 28 and 29 years' imprisonment, respectively, for each conviction. On appeal, defendant argues the court erred when it (1) denied his clear and unambiguous request to proceed *pro se*, (2) failed to conduct an adequate preliminary *Krankel* inquiry, (3) failed to grant his motion for substitution of judge for cause,

and (4) improperly added 12 aggregate years to his sentence following remand. We affirm as modified.

¶ 3                                I. BACKGROUND

¶ 4        In September 2016, defendant was charged by indictment with child pornography for knowingly filming E.S., a person he knew to be under the age of 18, while she was engaged in an act of sexual penetration with another person; aggravated criminal sexual assault for committing an act of sexual penetration with E.S. by use or threat of force while committing the above alleged offense of child pornography; and two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3), (4) (West 2016)) for committing acts of sexual penetration with E.S.

¶ 5                             A. Procedural Posture

¶ 6        In April 2017, defendant requested to represent himself, which the trial court granted. Later that same month, defendant filed a handwritten *pro se* motion, requesting counsel be appointed to represent him. The motion stated defendant "didn['t] finish enough school to creditably [*sic*] defend [himself]. Being only having [a general equivalency diploma]," he could not read case law, and he did not have access to an "adequate" law library. Defendant concluded he was not capable of representing himself in a "meaningful way." In May 2017, the court appointed counsel for defendant. That same month, defendant filed multiple *pro se* motions requesting (1) different counsel be appointed to represent him and (2) a substitution of judge. In July 2017, defendant withdrew the motions. Defendant subsequently, through counsel, filed a motion *in limine* to suppress video and audio recordings purportedly showing him engaging in a sexual act with E.S. Following a hearing, his motion was denied. A subsequent motion to reconsider and dismiss the indictment was also denied.

¶ 7         In January 2018, defendant waived his right to a jury and proceeded to a stipulated bench trial. Defendant was found guilty of all counts. In February 2018, he filed a motion to withdraw his agreement to a stipulated bench trial, claiming he was misinformed about the sentencing range for his charges. The trial court denied his motion. For sentencing, defendant's criminal sexual assault convictions were merged into the aggravated criminal sexual assault conviction. The court sentenced defendant to consecutive terms of 22 years' imprisonment for the child pornography conviction and 23 years' imprisonment for the aggravated criminal sexual assault conviction. Defendant filed a motion for new trial, acquittal, and to reconsider his sentence. The court denied defendant's motion. He appealed.

¶ 8         On appeal, defendant argued the trial court erred when it (1) denied his motion to suppress the video evidence and (2) failed to inform him he was subject to mandatory consecutive sentencing. See *People v. Starks*, 2020 IL App (3d) 180147-U, ¶ 2. The appellate court held "defendant's cousin [Cassadia King] did not commit eavesdropping when she retrieved the incriminating videos from the trash bin of defendant's online account." *Id.* ¶ 1. However, the appellate court found the trial court incorrectly admonished defendant "repeatedly concerning his potential sentencing range." *Id.* ¶ 25. Because defendant "relied on that misinformation when he waived his jury trial right and consented to the stipulated bench trial," the appellate court concluded the trial court abused its discretion when denying his motion to withdraw his agreement to a stipulated bench trial. *Id.* ¶ 26. The appellate court reversed and remanded for further proceedings. *Id.* ¶ 29.

¶ 9                          B. Proceedings Following Remand

¶ 10        In September 2021, defendant filed a motion *in limine* to submit a certificate of absence of business records from Google regarding his Gmail account, which the trial court later

granted. Shortly thereafter, defendant filed a *pro se* motion for substitution of judge, arguing the judge's "personal comments" about him as a father and a "man" demonstrated bias and prejudice. He also filed a *pro se* motion seeking substitution of his appointed counsel or to permit him to represent himself. Defendant argued his appointed counsel was not answering or returning his phone calls, was not filing motions he requested, and failed to call witnesses on his behalf. On September 16, 2021, the matter was continued to permit defense counsel to pursue further evidence in the matter.

¶ 11 In October and November 2021, defendant refiled his *pro se* motions. On January 24, 2022, a hearing was held on defendant's motion to substitute judge before Chief Judge Katherine Gorman. Judge Gorman denied defendant's motion, finding he had not demonstrated prejudice resulting from extrajudicial influence.

¶ 12 Judge Kevin Lyons presided over a hearing on defendant's motion to substitute appointed counsel or proceed *pro se*. The trial court informed defendant it would not substitute his appointed counsel. Defendant withdrew his request to proceed *pro se*. In March 2022, the matter was continued to allow defense counsel to follow up on defendant's request to contact "several witnesses." In May 2022, the court granted defendant another continuance to "pursue some witnesses." The matter was continued by agreement in July 2022. After several continuances, in October 2022, defendant sought another continuance because one of "four potential witnesses" was in the hospital and another would be available "after the holidays." The State objected, arguing the case was more than six years old and defendant's continuances were "only for delay." The court denied defendant's motion to continue.

¶ 13 On November 7, 2022, the matter proceeded to a jury trial. Prior to commencing *voir dire*, defendant requested a continuance because a witness was unavailable to attend due to

being hospitalized. Defendant stated the unavailable witness was around defendant and the victim when the alleged conduct occurred and would testify she had not observed any unusual behavior. The State argued the witness was not an expert and could not testify as to how a sexual assault victim should act and behave. The trial court denied defendant's motion to continue.

¶ 14　　　　　　Defense counsel informed the trial court: "Your [H]onor, [defendant] is asking that he be first chair and I be second chair, that I assist and he be the lead counsel on this case going forward." The court denied defendant's request. After a recess, the following exchange occurred

"THE DEFENDANT: I'm saying that if I can't [be first chair and appointed counsel be second chair], I am asking can I go forward without delay *pro se*?

THE COURT: No.

THE DEFENDANT: Can I know the reason why?

THE COURT: Because it's for the purpose of delay, and I am not going to do that. Do you have any other questions?

THE DEFENDANT: No. I said without delay. I'm competent enough to go today.

THE COURT: I am not going to do that, no. All right. Let's bring the jury down.

THE DEFEDANT: I don't believe that I'm being—this is fair to me, man.

THE COURT: It's not my goal.

THE DEFENDANT: It is your call, Your Honor.

THE COURT: It's not my goal. My goal is not to satisfy you. My goal is to follow the law, and we're going to do that. Be quiet."

¶ 15        Defendant filed a motion *in limine* to exclude the video purporting to show his alleged sexual conduct with E.S., which the trial court denied.

¶ 16                           C. Jury Trial and Posttrial Proceedings

¶ 17        Because defendant does not challenge the sufficiency of the evidence, we only summarize the trial evidence as it pertains to his contentions on appeal. E.S. testified the incidents occurred during the summer of 2016, when she was 15 years old. Defendant went through her phone and found photographs she had sent to a boy. Defendant sought to punish her for this and offered to "whoop her" or have her "sleep" with him. When E.S. chose to be "whooped," defendant raped her. She said defendant threatened to kill her "or somebody" if she told anyone what had happened. E.S. stated there were more than 20 incidents of sexual abuse by defendant, including oral, anal, and vaginal penetration. E.S. recalled defendant recording several of the incidents. Defendant told her he was going to sell the videos to an online pornographic website to make money for school clothes. E.S. stated she was scared of defendant and did not tell anyone what was happening for several months. She stated three other people lived in defendant's home, but she did not believe anyone was aware of what defendant had been doing to her and no one asked her if anything was wrong. She noted defendant would not engage in sexual conduct with her when defendant's girlfriend or his girlfriend's daughters were there.

¶ 18        Eventually, she told her twin brother. He wanted them to leave defendant's home immediately. E.S. cited her fear of defendant, and they agreed to let their older brother know the next day. E.S.'s older brother picked her and her twin brother up from school the next day and took them to E.S.'s mother's home in Calumet City, Illinois. E.S. and several other individuals

recovered video recordings defendant had made of the abuse and burned them to a disc to give to the police. At the close of the State's evidence, defendant moved for a directed verdict, which was denied.

¶ 19    Shannon Vaughn testified for defendant that she met him in May 2016. Vaughn stated her and her daughters stayed at defendant's home for extended periods of time that summer and that E.S. appeared "normal to [her]." Both of Vaughn's daughters also testified similarly to Vaughn and noted nothing unusual about E.S.'s behavior during the summer of 2016.

¶ 20    The defense rested, and the jury found defendant guilty on all counts.

¶ 21    On December 9, 2022, defendant filed a motion for new trial, which the trial court denied. Defendant also filed a *pro se* motion alleging ineffective assistance of counsel, claiming, *inter alia*, his appointed counsel failed to interview four witnesses who would have aided in proving his innocence. Additionally, defendant claimed his attorney failed to timely inform the court of defendant's desire to proceed "first chair" or *pro se*.

¶ 22    When the trial court began to address defendant's *pro se* ineffective assistance claims, the following exchange occurred between the court and the State:

> "THE COURT: Okay. Okay. So, what do we want to have a pre-*Krankel* thing? Is that what we're talking about?
>
> MS. SHELBY [(ASSISTANT STATE'S ATTORNEY)]: That's what it looks like. Most of the issues in that motion that were addressed and ruled on either—
>
> THE COURT: and raised many times?

MS. SHELBY: Yes. Were raised many times. Some of them were even addressed in the appellate court opinion from his last—from the reversal before.

THE COURT: Okay.

MS. SHELBY: He's titled it, 'Motion for ineffective assistance,' but I think most of this has already been ruled on."

¶ 23 The trial court then permitted defendant to argue his *pro se* motion for ineffective assistance. Defendant argued there were "multiple things that [he] felt should have been investigated that didn't get investigated. Witnesses that should have been called that didn't get called." Defendant claimed he never received photographs used by the State during grand jury testimony. He explained, "[W]hen I asked [my attorney] about them, he said that the State said that they're lost. So, I don't understand how—" The court interrupted defendant and said, "You think that was the lynchman of your case, huh?" Defendant responded, "No. I think it's everything that I written down was the lynchman in my case." The court permitted defendant to proceed with his argument:

"THE DEFENDANT: I said, like I said, that he didn't raise—he didn't raise a lot of these issues in—it's hard pulling these papers apart with these handcuffs. But there was witnesses that could have testified to the fact that it was inappropriate things that were in the phone from the beginning—videos and pictures. And it stated that what happened in the phone and what you allowed into evidence was actually of me. It was never asked what were the inappropriate things that were in the phone. Where is the phone? Because in the letter it said that it was supposedly—the phone was supposed to be mailed back to her. Where are these materials? So, it could have been checked to see what were in there.

- 8 -

And then [my cousin, King,] is one of the main culprits in this situation. She's the one that supposedly downloaded this from a Google account that they said was mine saying Google—we had the papers that wasn't even contested by the State that Google said they have no record of the account. And that wasn't even presented into evidence. So, if it was downloaded from a Google account and Google—the founders—saying that they don't have no record of it, how can they say it came from a Google account? It goes to the fact that where I said it was already in the phone. So, I don't understand how it was—the fact that it still—[King] is the one that said she downloaded it from a Google account, but she wasn't even called as a witness. Well, over and over she was mentioned throughout the trial of what she did and what part she played.

And not only that, like I said, the officer said that he took pictures of the supposed room to corroborate it with the video, and those pictures have never been presented at all.

And it's just, like I say, it's multiple things. It's all these things that I wrote in here. It's what I feel, you know. And I would just be reading them over and over. I've been reading them through to you when y'all have the motion of everything I listed on here.

THE COURT: Anything else?

THE DEFENDANT: No, because no matter what I say, it's irrelevant.

THE COURT: Anything else? All right. The defendant's motion has been considered. There's no basis for his—to support his claim of ineffective assistance.

The short answer to a trial that answers everything that he's raised is that the victim, herself, came and testified. And as awkward as it was and as embarrassing as I'm assuming it was, as demeaning as I'm assuming it was, the victim, herself, the defendant's daughter, sat in this witness chair and in front of 12 strangers and alternates had to point to a film, a video and say, that is me and that is my father. And not only is that a video of what he's doing to me, I was there.

So, while the defendant makes claims and wants to be self-pitied for what some lawyer may have done, could have done, should have done, didn't do, should've done when in his presence or not, the defendant needs to be afraid of the facts because the facts told on him. The motion is respectfully denied."

¶ 24        The trial court then addressed defendant's motion for a new trial. Defendant's appointed counsel stood on the written motion, and the court denied that motion as well. The matter proceeded to sentencing.

¶ 25                              D. Sentencing

¶ 26        The only addition to the original presentence investigation report (PSI) was an additional victim impact statement provided by E.S. Neither of the parties presented any additional evidence in aggravation or mitigation. The State argued that, while defendant was entitled to continue denying his guilt, he had become "a bigger monster than he was before" by putting E.S. through a trial. The State also noted the multiple continuances following remand were aggravating, and that the trial court had "wiggle room" to increase his sentence due to "defendant's behavior, these constant games." Defendant argued he had done nothing to warrant

a harsher sentence and that he had only exercised his due process rights by having a trial. The court then interrupted to state:

> "THE COURT: What about the impact it would have on [E.S.] who says she doesn't even want to have his name. And she says in her letter—and it doesn't get much more direct than this—I am damaged mentally, physically[,] and emotionally. And then she says, six years, why are we here? You did it and you know you did. If you're a real man who cared, you wouldn't be putting me through this.
>
> So, since we last met or since he was last sentenced, she has been put through this. And he's not to be punished for exercising his right to trial. But if the Court recognized that the defendant has been flippant, demanding[,] strident[,] and has actually extracted some sort of satisfaction from having his daughter and/or any relatives appear to prove he did what he did, would that be a factor? Would that allow for an increase in his sentence?"

¶ 27 Defendant argued his motion filing and jury trial demand, "without more," were not sufficient to justify an increase his sentence. The trial court then stated:

> "THE COURT: Just so that the record reflects that when we last had a sentence to—if we're going to use as a benchmark that the defendant got 22 and 23 years, respectively, and if he argues for less than that, which I understand that you do. But if there's a distinction or a difference to be noted for a record reader, the difference would be that we had a trial; that videos that were clear and distinct and graphic and forceful were presented one after the other after the other after the other in the presence of the defendant's own daughter while the defendant

stayed seated and has not expressed one ounce of contrition. In fact, if anything, by his accusations toward everyone else but himself seems to be a little bit more than just acquiescence in having his trial because the difference between the last sentence hearing and this sentencing hearing are the videos and the direct innuendo and the crush and the grasp and the twist that it has taken upon the victim to identify herself and to explain her father's behavior and—to strangers. That there is a difference.

Now, whether that would be a factor that would rise to the level of a different sentence, I just want to make those observations."

¶ 28    Defendant contended his jury trial demand was not intended to hurt E.S. and nothing in the record warranted increasing his sentence beyond the original sentence that was previously imposed. Defendant further argued he had a difficult childhood without his father being present and his mother, who abused drugs, was also potentially a prostitute. Defendant noted his positive relationship with his fiancée, to which the trial court said, "The lady he met online that bogged down his two daughters either for a week or two weeks for the summer depending on who you believe, that lady?" Defendant confirmed the fiancée was Vaughn, who had testified at trial, and argued Vaughn's daughters testified that defendant had a positive influence on their lives. The court then remarked, "Well, I guess there's that viewpoint." Defendant additionally noted he had earned 17 college credit hours while incarcerated and requested his sentence be reduced.

¶ 29    Defendant made a statement in allocution where he apologized to E.S. but denied his guilt. When addressing the State's claim that he had "played with the Court," defendant

stated there were a number of reasons the case went on as long as it did. Defendant denied he was the individual in the video. The trial court interrupted, and the following exchange occurred:

"THE COURT: So, that wasn't you?

THE DEFENDANT: No, it was not me.

THE COURT: Oh, I see.

THE DEFENDANT: But that's what it—it's being sarcasm and stuff like it—all these times, you know what I'm saying? I always respect you. I never said anything out of line or anything.

It was—in that video, I've been saying from the get-go it was videos in that phone, and it was not me in that phone, period.

And then, like I said, it said it was from a Google account. If it was, I—if it was and I done something, I never had a problem in any of my life accepting what I had coming and admitting to anything that I done wrong.

THE COURT: What did you do wrong?

THE DEFENDANT: I done a lot of wrong in my life.

THE COURT: Well, you just said it, so tell me what it was.

THE DEFENDANT: A lot.

THE COURT: Start with a few.

THE DEFENDANT: Start with a few? In the streets I—

THE COURT: You had sex with your daughter?

THE DEFENDANT: No, that is not one.

THE COURT: Didn't do that.

THE DEFENDANT: No, I did not.

THE COURT: So, she's lying about that.

THE DEFENDANT: You're going to try to make me say something or get into a verbal situation with you, and I'm not going to do it—

THE COURT: No. You said that you—

THE DEFENDANT:—I already stated what I had to say. So I'm through. No matter what you—whatever I say is irrelevant like I said to you.

THE COURT: When you get to the hard part, you have nothing to say.

THE DEFENDANT: No. It's not a hard part. You made it hard.

THE COURT: Yeah, I sure did.

THE DEFENDANT: You right.

THE COURT: Here's the mirror.

THE DEFENDANT: Yep.

THE COURT: Well, you've made it a little easier here for me, [defendant]. I've considered the [PSI], the evidence and arguments of the lawyers, the statement of allocution, such as it was presented by the defendant, and I've considered the statutory matters in aggravation, mitigation, history and character of the defendant, and I've given due regard for the circumstances and nature of the offense—horrendous as it is—and I make the following observations and findings: the defendant today is a different person than he was when he was sentenced before. He is callous. He's abrasive. He's confrontational. He wants to blame everyone else but himself. He wants to pretend and announce that he's a person that's willing to assume responsibility, to take responsibility for those

things he's done wrong as though all of this happening in the courtroom is some third thing.

I've done other things in my life he wants to say, but this stuff you're talking about here, Judge, and others, I wasn't part of that. I didn't have sex with my daughter, he says. I didn't do that.

Let the record reflect that this is the environment we have right here, today, December 14th of 2022. The record should reflect that the environment in this courtroom tone is this. A man, 48 years old, is seated in jail clothing, handcuffed about 15 feet away from his daughter. A daughter that was required to testify at the trial and sit 30 inches beneath a video depicting sexual conduct, penetration repeatedly over and over on several occasions from him on to her while she was a minor. And in this environment the record should show this 48-year-old man—creature has the goal to be 30 feet, 15 feet from his daughter and say by his actions and his conduct and his words, daughter, you're a liar and I am not.

Let the record reflect that the opposite is true. The defendant is the liar here. The defendant is the instigator here. The defendant is the criminal here. The defendant is the rapist here. It is the defendant who is the wrongdoer.

The rescuer are the police and the justice system. It has hobbled this case through. But the heroine here is the daughter of this defendant.

There aren't many people that could grow the backbone and the ability to walk themselves into a courtroom and stare down this man who wants to stare at everybody else thinking that his laser beam stares will knock them over. But this

woman—and in a strange twist, I might add, that even though [defendant] didn't build her, he simply was the provider of her origin. But he didn't build her because if he shaped her, she wouldn't be able to come into this courtroom.

He wanted to master over her, to lord over her, to be her owner. And for him to say differently today is a lie. He knows it. I know it. And the world knows it. I want his daughter to know that no reasonable person on this planet believes your father, and that is the last time I will refer to him as that. He is the defendant. He is a convicted predator. And he is to be sentenced to a prison because that's what prisons are for. They are built for you.

You are a man of many words, not good ones, [defendant]. You can't put a sentence together very well. You think like a child. If you just keep talking and battling out phrases, it will in someway mesmerize the listener, and they will think you have an argument. You have none. You have made it simple. You have presented yourself far worse than you were before. You have confronted your daughter in this courtroom and in construction and in fact told her and told me that she is lying and that you are not.

The Court finds that you are the liar. The Court finds that you are the assaulter. The court finds that your daughter has come to her own rescue when you wouldn't. You didn't even rescue her from you. What a shame to have the privilege of such a daughter and to turn yourself into such garbage while she shines and lifts herself from the city dump that you are. Says a lot about her and a lot more about you. It's the daughter of this man who said, you damaged me and

you don't care. It's bad enough that you damaged her, but it is so shameful of you that you don't care.

The record can reflect the defendant sits here with his lower lip pushed out. If there was a bubble above his head it would say, I don't care what you do. Screw the rest of you. I'm [defendant].

And then I noticed that your daughter says, you are a monster. It's all in your eyes. Well, [defendant], it would be in your soul, but you don't have one. It would be in your heart, but you gave that away years ago.

It's apparent why you're making the claims that you're making today; that [appointed counsel] is deficient; that [previously appointed counsel] is deficient; that somehow the scheduling of your case made things unfair to you. We all know why you're doing that so that from your prison cell in somewhere in a dark corner of Illinois you'll have something to while away the days away with, to write letters about, to add to your brief and your pleadings.

Well, have at it because the Court does find that the defendant has worsened himself then before. The Court does find that the daughter of the defendant has done a marvelous job at presenting the truth while the defendant has tried to present himself as a magic act, and magic is not the truth. You are a real piece of work. And the Court finds that when the daughter said, this didn't have to happen, but you made me do this, that the defendant replied, this didn't have to come to this. And then trying to thread the needle between I didn't do it and you're a liar. He said, I took advantage of the situation. Any reasonable soul

would say that was code for, I had sex with my daughter, but I don't want to tell anybody about it. Well, consider that secret out.

This is not a close call. The defendant did what he did. He was guilty of the elements of the offense of each count. The jury said so. It wasn't difficult for them, obviously, at all. And if there was a trophy to be given to courage and justice, I would give it to [E.] last name whatever she wants it to be."

¶ 30　　The trial court sentenced defendant to 28 years' imprisonment for the child pornography conviction and 29 years' imprisonment for the aggravated criminal sexual assault conviction, to be served consecutively. The court added, "Right down to the wire the defendant maintains he didn't do it. Without having to define the word, 'overwhelming,' the evidence in this case is overwhelming. The defendant did it. He's guilty and he knows it."

¶ 31　　Defendant filed a motion to reconsider his sentence, wherein he argued the trial court failed to account for several mitigating factors and improperly increased his sentence. The court denied the motion.

¶ 32　　This appeal followed.

¶ 33　　　　　　　　　　　　II. ANALYSIS

¶ 34　　On appeal, defendant argues the trial court erred when it (1) denied his clear and unambiguous request to proceed *pro se*; (2) failed to conduct an adequate preliminary *Krankel* inquiry by accepting input from the State, not remaining neutral, and failing to ask meaningful questions of defendant or his counsel; (3) failed to grant his motion for substitution of judge for cause; and (4) improperly added 12 aggregate years to his sentence following remand. We address each claim in turn.

¶ 35　　　　　　　　A. Denial of Request to Proceed *Pro Se* Claim

¶ 36    Defendant argues his request to proceed *pro se* on the first day of his jury trial was clear and unambiguous. The trial court denied his request as a delay tactic. However, defendant specifically stated he wanted to proceed *pro se* without delay and was prepared to move forward with his jury trial. The State contends defendant forfeited this issue by not properly objecting to the court's denial of his request or raising the issue in a posttrial motion.

¶ 37    We disagree with the State that defendant has forfeited this issue. "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant raised this issue in his motion for a new trial. On the day of trial, defendant verbally requested to proceed *pro se* after the trial court denied his request to be "first chair" in his own defense. When the court denied his request, he asked the court the reason for the denial. The court stated defendant's request was "for purposes of delay." Defendant said he was prepared to proceed *pro se* without delay and argued the court's denial was unfair to him. A contemporaneous objection "should be sufficiently specific to inform the court of the ground for the objection." *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 131 (quoting *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 239 (1992)). Here, defendant's objection was sufficiently specific and not merely a general objection. Thus, we find defendant did not forfeit this claim.

¶ 38    We review a trial court's denial of a defendant's motion to represent himself for an abuse of discretion. *People v. Fisher*, 407 Ill. App. 3d 585, 589 (2011). "This standard of review is deferential. Our mere disagreement with the court's decision would not make the decision an abuse of discretion." *Id.* A court abuses its discretion when its decision is arbitrary or

- 19 -

clearly illogical, such that it "goes outside the range of reasonableness and disregards established principles of law, thereby causing a party substantial prejudice." *Id.*

¶ 39        Ordinarily, "[a] defendant has a constitutional right to represent himself." *People v. Baez*, 241 Ill. 2d 44, 115 (2011). A defendant's "waiver of counsel must be clear and unequivocal, not ambiguous." *Id.* at 116. "Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted." *Id.*

¶ 40        The State argues the trial court did not err when denying defendant's request to proceed *pro se* because the request was disruptive to the proceedings. Defendant contends his request was clear and unequivocal and cites *People v. Davis*, 169 Ill. App. 3d. 1 (1988) and *People v. Hunt*, 2016 IL App (1st) 132979 in support.

¶ 41        In *Davis*, the defendant—on the morning his trial was to begin—filed a written motion seeking to represent himself and discharge his appointed counsel. *Davis*, 169 Ill. App. 3d. 1, 3 (1988). The trial court inquired whether the defendant had discussed his desire to represent himself with his attorney, and the defendant replied he had conflicts with his attorney regarding trial strategy and which witnesses to call. *Id.* at 6. The court summarily dismissed the defendant's motion. *Id.* On appeal, the appellate court noted "the trial court never made a finding that [the] defendant did not have the capacity to make an intelligent and knowing waiver of counsel." *Id.* The *Davis* court considered the defendant's age, education level, and familiarity with the criminal justice system. *Id.* at 7-8. The court specially noted the defendant had "been represented by the public defender, to his apparent dissatisfaction," where he had been convicted in a closely related case just prior to his instant case. *Id.* at 7. While the defendant had sought to represent himself on the morning of his jury trial, the court noted he "did not wish to delay proceedings,"

and the trial court did not consider delay in the proceedings as a determinative factor. *Id.* Thus, the appellate court reversed the trial court's denial of defendant's motion and remanded his case for a new trial. *Id.*

¶ 42    In *Hunt*, the defendant's counsel informed a substitute judge presiding over the courtroom that the defendant wanted to represent himself. *Hunt*, 2016 IL App (1st) 132979, ¶ 6. The defendant was admonished of the consequences of representing himself, but the substitute judge did not rule on his request; rather, the substitute judge continued the matter for defendant to "think about" the request and permit the trial judge to rule on the issue. *Id.* When the trial judge returned, defendant's request was denied as a "delay tactic" and the matter was set for jury trial. On appeal, the appellate court found the trial court had abused its discretion because the record did not support the finding the defendant's request was made to delay his trial. *Id.* ¶ 21. The *Hunt* court noted five of the six continuances were by agreement, with the last continuance coming on the trial court's own motion to permit defense counsel an opportunity to respond to the State's pretrial motion. *Id.* The appellate court also found the defendant had not engaged in any "obstructionist" behavior. *Id.* ¶ 22. The court reversed and remanded the matter for a new trial. *Id.* ¶ 27.

¶ 43    We find the case *sub judice* distinguishable from both *Davis* and *Hunt* primarily due to defendant's apparent delay tactics here. The courts in *Davis* and *Hunt* both found the defendants were not seeking *pro se* status to delay the trial proceedings. In *Davis*, the appellate court found the defendant had apparent complaints with his appointed counsel stemming from his very recent trial that predicated his request to represent himself. Regarding *Hunt*, the appellate court found the record did not support the finding defendant's request to represent himself was a delay tactic.

- 21 -

¶ 44    Here, unlike *Davis*, defendant sought to "first chair" his own defense while maintaining the services of his appointed counsel as "second chair." While defendant had voiced dissatisfaction with his previously appointed counsel, he clearly desired to keep his appointed counsel nearby in some advisory role for his trial. Once the trial court denied that request, he then pivoted to reasserting his request to represent himself. Additionally, unlike in *Davis*, the trial court here considered delay as a determinative factor. While a court must honor a defendant's right to represent himself where waiver of counsel is knowingly and intelligently made, this right is not absolute. This court has previously stated that a trial court may deny a defendant's request to proceed *pro se* when it comes "so late in the proceedings that to grant it would be disruptive of the orderly schedule of proceedings." *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991). In *Ward*, we cautioned "that when a request to proceed *pro se* is made and there is no request for additional time to prepare, a motion to proceed *pro se* should generally be viewed as timely as long as it is made before trial." *Id.* Defendant's request to proceed *pro se* in this instance cannot be viewed as timely and "before trial" in any reasonable sense because the trial had essentially already begun, with potential jurors awaiting as *voir dire* was about to commence.

¶ 45    Here, unlike *Hunt*, defendant sought and was granted multiple continuances of his trial date. Only one continuance following remand was by agreement between the parties. In October 2022, defendant sought yet another continuance of his trial, which was denied given the case was six years old at the time. Unlike *Hunt*, defendant, in the instant case, demonstrated a propensity to usurp his appointed counsel in many instances. In April 2017, he requested to proceed *pro se*, which was granted. However, shortly thereafter, he immediately requested counsel be appointed to his case. When his request was granted, he subsequently filed a motion

to have a different attorney appointed to his case that he later withdrew. Following remand of his case, defendant again sought to represent himself or get a different attorney appointed to his case. He refiled his request to proceed *pro se* later in 2021 but withdrew that request. It appears, upon recognizing that the trial court cannot simply appoint different attorneys to represent defendant at his whim, he devised a plan to sit "first chair" in his own defense with his appointed counsel taking an advisory role as "second chair." When this idea failed, defendant renewed his request to represent himself at the onset of his trial.

¶ 46        While defendant may claim he intended to proceed with his trial without delay, his behavior up until trial following remand did not demonstrate he intended to comply with an orderly schedule of proceedings. As we noted earlier, it is not enough for us to disagree with the trial court whether defendant should have been granted his request to proceed *pro se*. The abuse of discretion standard requires the court's decision be arbitrary and clearly illogical. We cannot say the court's decision to deny defendant's request to represent himself because it was a delay tactic is either arbitrary or clearly illogical. The trial court is in a far better position than this court to observe defendant's conduct and behavior. See *People v. Wiggins*, 312 Ill. App. 3d 1113, 1116 (2000) (noting, in the pretrial context of a *bona fide* doubt of a defendant's fitness, the trial court is in a far better position than a reviewing court to "observe and evaluate the defendant's conduct"). Moreover, we must "indulge in every reasonable presumption against" defendant's waiver of counsel. *Baez*, 241 Ill. 2d at 116. Accordingly, we find the court did not abuse its discretion when it denied defendant's request to proceed *pro se*.

¶ 47                    B. Inadequate Preliminary *Krankel* Inquiry Claim

¶ 48        A *pro se* posttrial claim alleging ineffective assistance of counsel is governed by the common-law procedure developed by our supreme court in *Krankel* and its progeny. *People*

*v. Roddis*, 2020 IL 124352, ¶ 34. "The procedure encourages the trial court to fully address these claims and thereby narrow the issues to be addressed on appeal." *Id.* Under this procedure, the trial court does not automatically appoint new counsel when a defendant alleges ineffective assistance of counsel; rather, the court first examines the factual basis of the defendant's claim. *Id.* ¶ 35. "Specifically, the trial court must conduct an adequate inquiry ***, that is, inquiry sufficient to determine the factual basis of the claim." (Internal quotation marks omitted.) *People v. Ayers*, 2017 IL 120071, ¶ 11. In doing so, the court considers the merits of the defendant's allegations in their entirety. *Roddis*, 2020 IL 124352, ¶ 61.

¶ 49        If the trial court determines the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the defendant's *pro se* claim. *Id.* ¶ 35. "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.* This permits new counsel to independently evaluate the defendant's claim and avoid a conflict of interest trial counsel would otherwise have, and new counsel would represent the defendant at a hearing on the *pro se* ineffective assistance of counsel claim. *Id.* ¶ 36. "The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*." *Id.* ¶ 33.

¶ 50        Following his jury trial, defendant filed a *pro se* motion alleging his trial counsel rendered ineffective assistance for, *inter alia*, failing to contact witnesses who would have testified to viewing the video evidence at an earlier date, and thus calling into question the State's entire case. The trial court acknowledged a preliminary *Krankel* inquiry was appropriate. Defendant argues the court's inquiry erroneously permitted input from the State and consisted only of a brief and hostile hearing before the court summarily dismissed his allegations. Because

- 24 -

the court failed to conduct an adequate inquiry, defendant argues this court should remand the matter for a proper preliminary *Krankel* inquiry.

¶ 51 Regarding its input, the State argues it was *de minimis* and does not require reversal. Our supreme court explained that

> "[b]ecause a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the State's participation at that proceeding, if any, be *de minimis*. Certainly, the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry." *People v. Jolly*, 2014 IL 117142, ¶ 38.

In *Jolly*, the trial court had permitted the State to question the defendant and his trial counsel extensively. *Id.* ¶ 40. Furthermore, the State "presented evidence and arguments contrary to [the] defendant's claims and emphasized the experience of [the] defendant's trial counsel." *Id.* The *Jolly* court reversed, concluding "the State and [the] defendant's trial counsel effectively argued against defendant" during the preliminary *Krankel* inquiry. *Id.*

¶ 52 In this case, the State provided input *after* the trial court queried whether to conduct a preliminary *Krankel* inquiry. The State commented that many of the issues in defendant's *pro se* motion had been addressed during his previous appeal. The State then relented that defendant was entitled to his motion and did not participate any further. Defendant argues the State's input framed the issues for the court and, thereby, made the proceedings adversarial and nonneutral. We disagree. The State did not question defendant and only addressed his claims generally rather than addressing any specific claim he made in his motion. It did not address the substance of defendant's claims and did not question defendant or discuss his trial counsel at all. Furthermore, the court stated it had read defendant's motion and gave him

an opportunity to argue his claims fully. We find the State's input was *de minimis* and did not convert the preliminary *Krankel* inquiry into an adversarial proceeding.

¶ 53        Defendant next contends the trial court's conduct during the inquiry was not neutral, as the court interrupted defendant and was dismissive of his claims. Defendant focused his claim on counsel's failure to investigate and/or call to testify four alleged witnesses who would have allegedly exonerated him. He cites *People v. McKinney*, 2023 IL App (4th) 220356-U, and *People v. Lawson*, 2019 IL App (4th) 180452, in support.

¶ 54        In *McKinney*, this court found the trial court's preliminary *Krankel* inquiry was inadequate because "it failed to ask either defendant or defense counsel any specific questions regarding the factual basis of the [defendant's] claims." *McKinney*, 2023 IL App (4th) 220356-U, ¶ 36. We remanded the matter for the court to assign new counsel to the defendant and conduct a *Krankel* hearing. *Id.* ¶ 50.

¶ 55        In *Lawson*, the State's primary witness testified that he did not know the defendant and had never seen him before the defendant robbed him. *Lawson*, 2019 IL App (4th) 180452, ¶ 50. Prior to trial, the defendant informed his attorney of a witness who would impeach that witness's testimony. However, trial counsel never called defendant's witness. *Id.* ¶ 51-52. Trial counsel gave a self-contradictory reason for not calling the defendant's witness, which the *Lawson* court concluded may have been an unreasonable trial strategy. *Id.* ¶ 53. The matter was remanded for the trial court to appoint new counsel and conduct further proceedings. *Id.* ¶ 59.

¶ 56        We find *McKinney* and *Lawson* distinguishable from the instant case. First, the record does not contradict the trial court's findings. Trial counsel in May 2021, March 2022, and May 2022, requested continuances in order to locate potential witnesses defendant had identified as having information to discredit the video evidence. In September 2021, defendant filed a

*pro se* motion seeking to substitute counsel or proceed *pro se*, stating counsel informed him the witnesses "won't answer the phone or respond to [counsel's] message." Defendant argued, "But that not what im [*sic*] told by them."

¶ 57          In October 2022, counsel again sought a continuance, claiming defendant had "four potential witnesses"—one who was in the hospital and another who would "ha[ve] more time available after the holidays." On the day of trial, counsel again asked for a continuance, noting one of the witnesses was unable to appear because she was in the hospital. When asked about the nature of this witness's testimony, counsel stated she would testify to being "around both the victim and [defendant]" when the alleged incidents occurred and "didn't sense anything was off."

¶ 58          The record clearly shows defense counsel diligently investigated and sought to utilize the witnesses defendant now argues were ignored. The crux of defendant's arguments at trial both during opening statements and closing arguments was that the video evidence did not depict defendant. Defendant claims these witnesses would have been integral to supporting his innocence. However, one of these witnesses was a State's witness, and another witness's purported testimony would have merely been duplicative of defendant's three witnesses, who each testified they had observed E.S. when the incidences occurred and did not perceive her to behave abnormally.

¶ 59          Unlike *McKinney*, the record in this case does not contradict the trial court's findings. Unlike in *Lawson*, there is no showing of possible neglect of an alibi witness. The trial court is "permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *People v. Ayers*, 2017 IL 120071, ¶ 12. The trial court gave defendant ample opportunities to emphasize his strongest

arguments at the preliminary *Krankel* inquiry. Rather than focusing on counsel's failure to contact requested witnesses, defendant chose to focus on grand jury testimony that was never utilized as evidence at trial. Nevertheless, the requested witnesses would not have testified to anything equivalent to an alibi. Accordingly, we find the trial court conducted an adequate preliminary *Krankel* inquiry.

¶ 60                                    C. Substitution of Judge for Cause Claim

¶ 61            Defendant next argues Judge Lyons demonstrated prejudice against him to the extent he could not have received a fair trial. He concedes this issue was not raised in his posttrial motion and asks that we review it under the plain-error doctrine. The plain-error doctrine requires a defendant first establish a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. Second, the defendant must show either "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Here, defendant seeks review under the second prong.

¶ 62            To prevail on a motion to substitute a judge for cause, a defendant must show facts and circumstances indicating the judge is actually prejudiced against him. *People v. Patterson*, 192 Ill. 2d 93, 131 (2000). "To meet this burden, the defendant must establish animosity, hostility, ill will, or distrust towards this defendant." *Id.* On review, we will not disturb a finding on a motion for substitution of judge unless that finding is against the manifest weight of the evidence. *People v. Mercado*, 244 Ill. App. 3d 1040, 1047 (1993).

¶ 63            Defendant highlights the trial court's comments during his original sentencing. He notes the court said, "I'd make the following findings and observations. [Defendant], you are a

full can of nuts or something." After defendant indicated he had difficulty finding employment while having a prior sex offense conviction, the court stated:

> "But here's what's interesting to me, and not in a good way: You seem to imply that you didn't have an economic opportunity, you didn't get a job because you had this scarlet letter on you from this sex offense. It's because you have some sort of illness. You're allergic to work. Not only are you not a worker, you're whatever the opposite of worker would be. Whatever that term is, that would be you.
>
> But you do some things with great consistency. The defendant has fathered a total of nine children with six different women. That they know of, I'm guessing."

Defendant contends the court's comments are not supported by the record and merely constitute an *ad hominem* attack. Specifically, the PSI showed he worked numerous jobs and was close to five of his nine children. Defendant admitted "he could have been a better father," and he did not want his children to grow up "in a home with drugs and violence." In support of his arguments, defendant cites *People v. Fisher*, 2023 IL App (4th) 220717, and *People v. Montgomery*, 2023 IL App (3d) 200389.

¶ 64    In *Fisher*, this court noted the judge—who was the same judge as in the case *sub judice*— made "remarks toward [the] defendant, [which,] taken together, constitute a *tour de force* of sarcasm and scorn establishing the trial court's prejudice against [the] defendant." *Fisher*, 2023 IL App (4th) 220717, ¶ 40. In *Fisher*, we noted numerous incidents where the court made improper derogatory and sarcastic remarks regarding the defendant's behavior in jail, his decision to have a jury trial, the sex offender evaluation, the defendant's

mother's death, the fact that the defendant fathered many children, and the defendant's limited intellectual ability. *Id.* ¶¶ 36-39. Due to the court's conduct, we remanded the matter for a new sentencing hearing before a different judge. *Id.* ¶ 45.

¶ 65    In *Montgomery*, the appellate court also reversed and remanded the matter for a new sentencing hearing before a different judge. *Montgomery*, 2023 IL App (3d) 200389, ¶ 35. That case also involved the same judge as the instant case. The *Montgomery* court concluded the trial court "failed to hide its animosity toward defendant" and explained:

> "The court's animosity was laid bare in the sentencing hearing when it
>
> (1) mimicked defendant's demands to the arresting officer, (2) referred
>
> dismissively to defendant's wife, (3) envisaged a hypothetical prison scenario
>
> where it would personally discredit [the] defendant's claims of mistreatment,
>
> (4) criticized the arresting officer's patience in dealing with [the] defendant,
>
> (5) suggested the officer should have tased defendant upon noncompliance, and
>
> (6) most disconcerting of all, stated it would have killed defendant if it were in the
>
> store clerk's shoes." *Id.* ¶ 32.

¶ 66    We recognize that *Fisher* and *Montgomery* both concern the same judge and his comments toward defendants, and we agree with both cases that a "judge should be patient, dignified, and courteous to litigants, jurors and witnesses, lawyers and others with whom he deals in his official capacity." *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990). Indeed, we admonish the trial court judge again here today that his choice of words and sarcastic demeanor do not adhere to the high standards expected of judges. However, the judge's comments in this case were relatively reserved in comparison to the comments made in *Fisher* and *Montgomery*.

¶ 67        Defendant carries the burden of showing prejudice, and that burden requires he "establish not merely the possibility of prejudice, but also that prejudice tangibly exists." *Mercado*, 244 Ill. App. 3d at 1045. This court's decision to disqualify a judge based on "prejudice is a judgment not to be made lightly." *People v. Kluppelberg*, 257 Ill. App. 3d 516, 535 (1993). At sentencing, a trial court is given great latitude, though not without limit. *Fisher*, 2023 IL App (4th) 220717, ¶ 40. Furthermore, the trial court, "having observed the defendant and the proceedings, is in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits than a reviewing court, which must rely on a 'cold' record." *People v. Little*, 2011 IL App (4th) 090787, ¶ 24. A "trial judge is not limited to considering statutory aggravating factors, and he may consider any fact which would tend to aggravate the offense." *People v. Helm*, 282 Ill. App. 3d 32, 34 (1996).

¶ 68        We note the context of the trial court's statements at issue on this appeal occurred during the first sentencing hearing. At a sentencing hearing, the court is generally expected to articulate its reasons regarding a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits when imposing sentence. We find defendant has failed to show prejudice from the court's comments at his original sentencing hearing. We also observe that where a defendant's case is remanded for error following a sentencing hearing, a reviewing court should be cautious to permit a defendant to weaponize a judge's findings at a vacated sentencing hearing as casting a pall of prejudice on future proceedings.

¶ 69        Following remand, the trial judge did not display any of the behaviors or make comments remotely approaching those which were discussed in either *Fisher* or *Montgomery*. Defendant does not point to any comments by the judge that show tangible prejudice existed

following remand. The record demonstrates that on remand, the judge was patient and accommodating to defendant's requests for continuances and *pro se* filings. Defendant's motion for substitution of judge for cause was held before a different judge, who reviewed the entire record along with defendant's motion. Because Judge Gorman's decision to deny defendant's motion was not against the manifest weight of the evidence, we find no clear error occurred and honor defendant's forfeiture of this issue.

¶ 70                                    D. Improper Increase of Sentence Claim

¶ 71            Defendant argues the trial court imposed a harsher sentence following remand because he chose to exercise his right to a jury trial. The State argues this issue was forfeited. We disagree with the State that this issue was forfeited. Recall, "[t]o preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *Sebby*, 2017 IL 119445, ¶ 48. Defendant clearly articulated at sentencing that he had done nothing to warrant an increased sentence other than exercise his due process rights and raised the issue again in his motion to reconsider sentence. As such, defendant has not forfeited this claim.

¶ 72            "The legislature sets forth by statute the range of permissible sentences for each class of criminal offense." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "A sentence within statutory limits will not be deemed excessive and an abuse of the court's discretion unless it is 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20 (quoting *Fern*, 189 Ill. 2d at 54). A reviewing court affords great deference to a trial court's sentencing judgment because, "having observed the defendant and the proceedings, [it] is in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment,

and habits than a reviewing court, which must rely on a 'cold' record." *Little*, 2011 IL App (4th) 090787, ¶ 24. A sentence that falls within the applicable statutory limits is reviewed for an abuse of discretion. *People v. Price*, 2011 IL App (4th) 100311, ¶ 36.

¶ 73    However, a trial court on resentencing is limited by section 5-5-4 of the Unified Code of Corrections (Code). 730 ILCS 5/5-5-4 (West 2022). "[T]he purpose of section 5-5-4 of the Code is to ensure the due process rights" of a defendant and prevent "vindictiveness in resentencing a defendant for having exercised his appeal rights." *People v. Woolsey*, 278 Ill. App. 3d 708, 710 (1996). The Code provides in relevant part that the resentencing court "shall not impose a new sentence for the same offense *** which is more severe than the prior sentence *** unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5-5-4(a) (West 2022); *People v. Moore*, 359 Ill. App. 3d 1090, 1092 (2005). Whether due process has been violated is a question of law reviewed *de novo*. *People v. Totzke*, 2012 IL App (2d) 110823, ¶ 17.

¶ 74    The State argues the trial court did not err because defendant had become more callous, abrasive, and confrontational following remand, thereby permitting the court to impose a harsher sentence. Defendant contends the record supports his argument that the only difference following remand was his jury trial demand. He claims the record does not support a finding that his conduct warranted a harsher sentence. He cites *People v. Strawbridge*, 404 Ill. App. 3d 460 (2010) in support.

¶ 75    In *Strawbridge*, the defendant was originally sentenced to 9 years' imprisonment and, following remand, he was resentenced to 12 years' imprisonment. *Id.* at 470. The appellate court construed the plain meaning of "conduct" from the Code to require a defendant demonstrate a "behavior" or "some type of act on [a] defendant's part" warranting a more severe

sentence and not merely displaying "a certain attitude toward one's crime or a belief about one's past." *Id.* at 471. In that case, the trial court noted the defendant's statement in allocution failed to indicate any remorse and the testimony of a caseworker indicated the defendant was more likely to recidivate due to his denial of "his own victimization." *Id.* at 470. The court found these reasons did not meet the definition of conduct and modified his sentence to the original sentence that was imposed prior to remand. *Id.* at 471.

¶ 76　　　　In this case, the trial court followed its comments that defendant was a "different person" following remand by stating he was callous, abrasive, and confrontational. The court went on to state defendant was unwilling to take responsibility for his actions and sought to blame others. The court stated defendant was essentially—while not literally—calling E.S. a liar. However, the court's reasons that defendant was different following remand all go toward how the court perceived defendant's attitude regarding his guilt. While we do not diminish those reasons for the court's decision to impose a harsher sentence, they do not identify any *conduct* on the part of defendant that would warrant a harsher sentence. We reiterate the sentiments of the special concurrence from *Strawbridge* noting a defendant has no incentive to plead guilty to get leniency at sentencing; "[t]hat is, he has nothing to lose by going to trial after the first conviction is vacated by the appellate court regardless of the reasons—he might get acquitted, but even if he is convicted, he is guaranteed to come out no worse than he did" prior to remand. *Id.* at 473 (Zenoff, J., concurring).

¶ 77　　　　Accordingly, we agree with defendant that the trial court erred when it resentenced him to a more severe sentence. Defendant asks that we exercise our powers under Illinois Supreme Court Rule 615 (eff. Jan. 1, 1967) and reimpose the original sentence. We agree and, accordingly, reduce defendant's sentence for the child pornography conviction to 22 year's

imprisonment and for the aggravated criminal sexual assault conviction to 23 years'

imprisonment. See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). All other aspects of defendant's

sentences will remain as imposed by the trial court, including that they run consecutively.

¶ 78                                    III. CONCLUSION

¶ 79            For the reasons stated, we reduce defendant's sentence for each conviction

entered to 22 and 23 years' imprisonment, respectively. We otherwise affirm the judgment of the

trial court.

¶ 80            Affirmed as modified.