NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231251-U

NO. 4-23-1251

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 26, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| ANTWAN JOHNSON, | ) | No. 21CF15 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) the State's evidence was sufficient to prove defendant's guilt beyond a reasonable doubt, (2) the trial court did not err in denying defendant's request to proceed *pro se*, (3) the unlawful possession of a weapon by a felon statute was not facially unconstitutional and any as-applied challenge would be premature, and (4) defendant's seven-year sentence for unlawful possession of a weapon by a felon was not excessive.

¶ 2    Following a jury trial, defendant, Antwan Johnson, was found guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2020)) and sentenced to seven years' imprisonment. On appeal, defendant argues (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt, (2) the trial court improperly denied his request to proceed *pro se* at trial, (3) the UPWF statute is unconstitutional, both facially and as applied to him, and (4) the court's sentence of seven years' imprisonment was excessive. We disagree and

affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In January 2021, defendant was charged with unlawful possession of a stolen firearm (count I) (*id.* § 24-3.8(a)) and UPWF (count II) (*id.* § 24-1.1(a)). The trial court set defendant's bond at $100,000 (10% to apply).

¶ 5                                     A. Pretrial

¶ 6          Defendant hired private counsel, Michael Malin, to represent him. On February 3, 2021, Malin filed a motion to modify defendant's bond, requesting a bond reduction. Following a hearing, the trial court denied Malin's motion. On March 2, defendant posted bond and was released from custody. Defendant subsequently failed to appear at a pretrial hearing on June 23, and a warrant was issued for his arrest, with bond set at $200,000 (10% to apply). While defendant was on warrant status, Malin filed a motion to withdraw as counsel, which was granted by the court.

¶ 7          On February 6, 2023, defendant was arrested on the outstanding warrant. Because Malin had withdrawn as counsel, defendant requested a public defender to represent him. Andrew Lankton was appointed, and defendant's case was set for a pretrial hearing on March 15.

¶ 8          At the pretrial hearing, defendant expressed dissatisfaction with Lankton's representation and requested a new attorney. Defendant informed the trial court Lankton refused to file multiple motions, including a motion to reduce bond, a motion to reinstate bond, and a motion to "squash [the] bench warrant." The court explained to defendant (1) the bench warrant was already served on him; consequently, there was nothing to quash and (2) his prior bond was forfeited; accordingly, there was no bond to reinstate. The court then asked Lankton to address defendant's contention he requested a motion to reduce bond be filed. Lankton informed the court

he refused to file a motion to reduce bond because defendant was requesting a recognizance bond. Lankton knew this request would be frivolous, given defendant's history of failing to appear and the severity of the pending charges. The court advised defendant it agreed with Lankton's position and stated:

"I will heartily agree with Mr. Lankton. The chances of you getting a [personal recognizance] bond are absolutely nothing. There is no—there is no chance in this world I would ever give you a [personal recognizance] bond. You know, you have absconded from this court for well over a year, sir."

It then inquired what other issues, if any, defendant wanted to raise about Lankton's representation. In response, defendant stated, "Like I said, he's not here on my best interests." When asked to elaborate on this statement, defendant responded, "I don't feel comfortable with putting my trust in him to go to trial." Following this exchange, the court found defendant's claims regarding Lankton insufficient to warrant the appointment of new counsel. The court then admonished defendant his case remained set for a jury trial on March 27. Defendant responded, "Well, I will hire my own."

¶ 9 On the day of defendant's jury trial, the State indicated it was dismissing count I and proceeding only on count II. When the trial court asked if the defense was ready to proceed to trial, Lankton stated, "It is my understanding that [defendant] does not wish me to represent him." The court inquired whether defendant intended to represent himself, and defendant indicated he had a different attorney in mind but had not hired him. The court then informed defendant, since he had not hired different counsel, "Mr. Lankton is your attorney, and this case will proceed to jury trial, then." Defendant protested and insisted Lankton was "a dismissive counsel" and it was a conflict for Lankton to represent him. However, the court simply reiterated Lankton would be

representing defendant.

¶ 10 Following a recess, defendant returned with multiple *pro se* motions he wished to file. The trial court informed defendant it would not consider the motions because defendant was represented by Lankton. In response, defendant stated he wanted to represent himself. The following exchange then occurred:

"THE COURT: Okay. [Defendant], you have just said you wish to represent yourself; is that correct?

THE DEFENDANT: Yes.

THE COURT: Do you want to explain why you're choosing to represent yourself on the cusp of a serious jury trial in which if you're convicted I have to sentence you to prison?

THE DEFENDANT: I mean, we went over this several times.

THE COURT: You're going to answer my questions, aren't you? Or I'm not granting your motion.

THE DEFENDANT: I believe I have a better chance defending myself.

\* \* \*

THE COURT: The Constitution of the United States, the Constitution of the State of Illinois guarantees to you a right to an attorney. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: Presenting a defense in a criminal case is not a matter of simply telling one's story. It requires adherence to very technical rules. The rules of evidence, the rules of criminal procedure. Those rules govern the conduct of a trial. You will be expected to adhere to those rules just as much as the State. An attorney

has substantial experience and training in trial procedure. And the prosecution, in this case Mr. Minger, is an exceptionally experienced trial attorney. He has a law degree. He has passed the bar exam. He has tried hundreds if not thousands of jury trial cases before. Have you ever tried a jury trial on your own, [defendant]? I'm not going to let you represent yourself if you're not going to answer my questions. You either are going to cooperate with me and conduct yourself appropriately, or I'm not going to let you represent yourself. Now, you can't just sit there and not answer my questions.

THE DEFENDANT: No.

THE COURT: So do you understand that you will be at a significant disadvantage in facing an experienced trial attorney?

THE DEFENDANT: Yeah.

THE COURT: A person unfamiliar with legal procedures may allow in this case the prosecution an advantage by failing to make objections to inadmissible evidence, by not making effective use of such rights as your jury selection process or *voir dire* of the jurors. You may make tactical decisions that produce unintended consequences for how you choose to present the case. Do you understand this?

THE DEFENDANT: Yeah.

THE COURT: If you choose to represent yourself, you will not be allowed to complain on appeal about how well you did or didn't do in representing yourself. Do you understand that? I need you to answer my question, [defendant].

THE DEFENDANT: Yeah, I understand.

THE COURT: If I have to ask you to answer my questions one more time,

we're going to end this exchange, and Mr. Lankton will represent you. Because I don't—I am not certain you understand or have the ability to cooperate to try your case effectively.

The effectiveness of you representing yourself could be diminished by your dual role as an attorney and an accused. One of the very biggest—one of the most significant advantages that an attorney provides to you is his dispassionate analysis of the case and presentation of evidence and the credibility that comes from having a neutral, detached person that would argue your case as opposed to you trying to argue your case to the jury. Do you understand this?

THE DEFENDANT: I wasn't sure of the question.

THE COURT: Okay. What didn't you understand about it? I got news for you. This case is going to get a lot more complicated than these questions. If you're not able to understand these questions, you're not able to represent yourself. Do you understand you will receive no special consideration from the court? I'm not allowed to. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: An attorney can render important assistance by determining the existence of possible defenses to the charges through consultation with the prosecutor through, potentially, reduced charges or during this trial lesser included offenses, perhaps. I don't know of what those would be in this case, but potentially. And even in the event of a conviction by presenting to the court matters which may lead to a lesser sentence. Do you understand this?

THE DEFENDANT: I didn't clearly get the question.

THE COURT: Okay. I don't think you're capable of representing yourself since you don't understand the English language or don't understand these questions well enough. The request to represent yourself is denied."

After denying defendant's request, the parties proceeded to a jury trial.

¶ 11                                    B. Jury Trial

¶ 12          Prior to opening statements, the parties informed the trial court defendant would stipulate he had a prior felony conviction.

¶ 13                        1. *Testimony of Officer Kayley Burke*

¶ 14          In January 2021, Kayley Burke was the evidence technician for the City of El Paso Police Department. As part of her employment, Burke logged all evidence that came into the police department. She explained that when an item was collected by an officer, the officer then placed it in a box or bag, sealed it, signed it, and placed it into an evidence locker. After an item was placed in an evidence locker, Burke would remove it, log it, and place it in the evidence room. Burke and the police chief were the only two people who had a key to the evidence room.

¶ 15          Burke identified People's exhibit No. 3 as an evidence box containing a firearm. After examining the box, Burke testified it was "in the same condition as when [she] received it from an evidence locker on January 18th, 2021." She was able to determine, based on the markings on the box, it was placed into the evidence locker by Officer Derric Porch. After opening the box, Burke identified the contents as a 9-millimeter Glock 26 firearm.

¶ 16                        2. *Testimony of Officer Derric Porch*

¶ 17          On January 17, 2021, Derric Porch was working as a patrol officer for the City of El Paso Police Department. That night, Porch received a call to assist Officer Branden Mounce with a traffic stop. When Porch arrived at the traffic stop, he observed Mounce speaking with

defendant outside the vehicle. Porch learned there were two firearms located inside the vehicle. Defendant initially denied ownership of either firearm, but when Porch told him to be honest, defendant "slumped his shoulders and put his head down *** like he was defeated" and admitted one of the firearms belonged to him. Both firearms were located in the passenger side glovebox, directly in front of where defendant was seated. Porch retrieved the firearm which belonged to defendant, a Glock 26, placed it into an evidence box, transported it to the police department, and placed it into an evidence locker. Porch identified People's exhibit No. 3 as the Glock 26 firearm located inside the glovebox. People's exhibit No. 3 was then admitted without objection.

¶ 18 On cross-examination, Porch indicated Mounce was the one who located the firearm in the glovebox. However, Porch was the one who logged it into evidence because Mounce transported defendant to the jail. While at the traffic stop, Porch overheard one of the passengers tell Mounce one of the firearms belonged to defendant. According to Porch, the glovebox was locked, but he did not know who locked it or when. Porch acknowledged defendant was not the owner of the vehicle.

¶ 19 On redirect examination, Porch stated the owner of the vehicle provided officers with a key to unlock the glovebox.

¶ 20 3. *Testimony of Officer Branden Mounce*

¶ 21 On January 17, 2021, around 10:15 p.m., Officer Branden Mounce performed a traffic stop on a silver Nissan. Mounce stopped the Nissan because it did not have a rear license plate. There were three individuals inside the vehicle: the driver, a front passenger, and a rear passenger. Mounce identified defendant as the front passenger and Eric Perkins as the driver. After gathering identification from the individuals, Mounce learned the vehicle's registration was suspended. Mounce informed Perkins the vehicle would be towed, based on the suspended

registration, and asked if there was anything in the vehicle officers should know about. Perkins indicated there were two firearms in the glovebox: a Glock 19, which belonged to him, and another firearm, which belonged to defendant. According to dispatch, Perkins had a valid firearm owners identification (FOID) card but defendant's FOID card was revoked. Because there were firearms in the vehicle, Mounce ordered all the occupants to step out so he could secure the firearms.

¶ 22       Officers Mounce and Porch searched the vehicle together and the firearms were found in the glovebox, directly in front of the front passenger's seat. The glovebox was locked; however, officers could not locate a key, so they "[e]nded up pulling somewhat hard on it, and it popped down." When the State inquired further about how the officers opened the glovebox, Mounce indicated Porch "pull[ed] on it a little harder than typical," and it opened. The two firearms in the glovebox were a Glock 19 and a Glock 26. Mounce identified People's exhibit No. 3 as one of the firearms from the glovebox. When Mounce asked defendant if either of the firearms belonged to him, defendant initially denied it, but he eventually admitted one of the firearms was his. Defendant stated he did not know which model his firearm was.

¶ 23       Mounce identified People's exhibit No. 1 as the video from his squad car the night defendant was arrested. The video was admitted without objection and a portion of it was played for the jury. Mounce testified the video showed Porch asking defendant if the firearm was his and defendant admitting it was. Mounce acknowledged it was difficult to hear defendant on the video; however, Mounce was present when the video was recorded and remembered defendant answering yes about the firearm being his. The State played another portion of the video, in which a conversation between Mounce and defendant can be heard. During this conversation, Mounce asks defendant which model of firearm belongs to him and defendant answers he does not know.

¶ 24       On cross-examination, Mounce testified he was the one who placed the firearm into

an evidence bag and transported it to the police station. Before he transported the firearm to the station, he transported defendant to the jail. During that time, the firearm was in the trunk of Mounce's squad car. Mounce acknowledged he did not stay with his squad car the entire time between when he placed the firearm in the trunk and when he removed the firearm to take it into the police station. However, Mounce indicated his squad car was locked when he was not with it. Additionally, when Mounce returned to his squad car after taking defendant inside the jail, his squad car was still locked. He then immediately proceeded to the police station. Porch put the firearm into an evidence box and then into an evidence locker because Mounce was busy typing his report.

¶ 25    On redirect examination, Mounce confirmed the serial number he provided to dispatch at the traffic stop was the same serial number on the firearm in State's exhibit No. 3.

¶ 26                    4. *Jury Questions and Verdict*

¶ 27    The State rested and defendant did not present any evidence. After closing arguments, the jury began its deliberations. During deliberations, the jury asked two questions: "Does ownership of the gun make a difference on the constructive possession of the gun?" and "Does his knowledge of a firearm being in the glove box place constructive possession over the defendant?" The parties, by agreement, answered the jury's questions with the following statement: "You have received the evidence and the instructions. You are to consider the evidence and determine the relevant issues as instructed." After resuming deliberations, the jury found defendant guilty of UPWF.

¶ 28                    C. Sentencing

¶ 29    At defendant's sentencing hearing, defendant gave a brief statement in allocution. Defendant requested the trial court be fair in its sentence, noted his mistakes do not define him,

and stated he graduated from high school, went to college, and worked to provide for his family.

¶ 30        The State highlighted defendant's criminal history, which included two prior felonies and seven misdemeanors, and requested a sentence of eight years' imprisonment.

¶ 31        Defense counsel discussed multiple factors in mitigation which applied to defendant, including defendant's actions did not contemplate causing harm to anyone; there was no harm caused to anyone; defendant had no prior sentences to the Illinois Department of Corrections; defendant had worked to provide for his family since he was 16; and defendant completed high school and attended some college. Defense counsel requested a sentence of three years' imprisonment.

¶ 32        The trial court agreed with defense counsel there was no harm caused and no threat of harm in defendant's conduct. Additionally, defendant was a high school graduate who attended some college, which showed he had talent. However, the court found defendant's prior criminal history was a significant aggravating factor. The court also found a sentence was necessary to deter others from the same conduct. Lastly, the court highlighted defendant's behavior in absconding for over a year and committing another felony offense while on warrant status. Ultimately, the court sentenced defendant to seven years' imprisonment.

¶ 33        Defendant filed a *pro se* motion to reconsider the sentence, which indicated he felt the sentence was too harsh, given the offense was nonviolent and he had never been to prison. Following a hearing, the trial court denied defendant's motion. Defendant timely filed a notice of appeal.

¶ 34        This appeal follows.

¶ 35                                II. ANALYSIS

¶ 36    On appeal, defendant contends (1) the State's evidence was insufficient to prove his guilt beyond a reasonable doubt, (2) the trial court improperly denied his request to proceed *pro se*, (3) the UPWF statute is unconstitutional, both facially and as applied to defendant, and (4) the court's sentence of seven years' imprisonment was excessive.

¶ 37                           A. Sufficiency of the Evidence

¶ 38    When a challenge is raised regarding the sufficiency of the evidence, the question before this court is whether, after reviewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. In a criminal case, the State must prove a defendant's guilt beyond a reasonable doubt as to each element of an offense. *People v. Murray*, 2019 IL 123289, ¶ 28. This court will not reverse a criminal conviction for insufficient evidence "unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Sauls*, 2022 IL 127732, ¶ 52.

¶ 39    The offense of UPWF prohibits "a person [from] knowingly possess[ing] on or about his person *** any firearm *** if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2020). On appeal, defendant does not allege the State failed to prove he was previously convicted of a felony. Thus, we focus our analysis on whether the State proved defendant knowingly possessed a firearm.

¶ 40    The UPWF statute allows the State to prove a defendant had either actual or constructive possession of a firearm. *People v. Wise*, 2021 IL 125392, ¶ 24. " 'Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it.' " *Id.* (quoting *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27). Conversely, constructive possession is " 'where the

person has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area where the firearm is found.' " *Id.* ¶ 25 (quoting *People v. Brown*, 2020 IL 124100, ¶ 11). In this case, the State charged defendant with constructive possession of a firearm, alleging defendant possessed a firearm "about his person."

¶ 41　　　　Defendant argues his case is analogous to *Wise*, in which our supreme court found the State failed to prove the defendant constructively possessed a firearm located in his vehicle. We disagree. In *Wise*, officers performed a traffic stop on the defendant's minivan. *Id.* ¶ 3. There were three occupants inside the minivan: the defendant, who was the driver; a front passenger; and another passenger seated in the third row of the minivan. *Id.* Officers performed a probable cause search of the vehicle, after smelling burnt cannabis, and found a firearm in a cupholder " 'in the rear passenger compartment.' " *Id.* ¶ 4. While the defendant admitted he knew the firearm was in the vehicle, it was approximately 5 to 10 feet away from the defendant and closest to the third-row passenger. *Id.* ¶ 34. Additionally, one of the officers testified he did not believe the defendant could reach the firearm from the driver's seat. *Id.* The crime lab did not locate the defendant's fingerprints on the firearm. *Id.* Based on this evidence, our supreme court determined the State failed to prove the defendant constructively possessed the firearm located in the vehicle. *Id.* ¶ 39.

¶ 42　　　　In this case, the firearm was located in the front passenger glovebox of the vehicle—directly in front of where defendant was seated when the vehicle was stopped by officers. Defendant could have easily reached the firearm from his position in the vehicle. Although defendant argues the glovebox was locked, he admits the officers simply pulled down hard on the glovebox and it opened. Therefore, it is conceivable defendant could have accessed the firearm, even though the glovebox was locked. For these reasons, we find the jury could have reasonably found the State proved defendant guilty of UPWF beyond a reasonable doubt.

¶ 43                    B. The Right to Self-Representation

¶ 44          "A defendant has a constitutional right to self-representation." *People v. Woodson*,

2011 IL App (4th) 100223, ¶ 20. This court has long held:

> "If a defendant makes a timely and unequivocal choice to proceed *pro se* in
> a criminal case and if, after admonitions pursuant to Illinois Supreme Court Rule
> 401(a) (eff. July 1, 1984), the trial court finds the choice to be knowing and
> intelligent, the court must honor the choice, regardless of how unwise the choice
> might be." *People v. Fisher*, 407 Ill. App. 3d 585, 585-86 (2011).

However, the right to proceed *pro se* is " 'not absolute and may be forfeited if the defendant

engages in serious and obstructionist misconduct, or if he cannot make a knowing and intelligent

waiver of counsel.' " *People v. Ashoor Rasho*, 398 Ill. App. 3d 1035, 1041 (2010) (quoting *People

v. Rohlfs*, 368 Ill. App. 3d 540, 545 (2006)).

¶ 45          A trial court's denial of a defendant's request to proceed *pro se* is reviewed for an

abuse of discretion. *People v. Burton*, 184 Ill. 2d 1, 25 (1998). "This standard of review is

deferential. Our mere disagreement with the court's decision would not make the decision an

abuse of discretion." *Fisher*, 407 Ill. App. 3d at 589. "An abuse of discretion will be found only

when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person

would take the view adopted by the trial court." *People v. Hood*, 2022 IL App (4th) 200260,

¶ 86. Additionally, this court may affirm for "any reason warranted by the record, regardless of

the reasons stated by the lower court." *People v. DeBerry*, 372 Ill. App. 3d 1056, 1058-59 (2007)

(citing *People v. Sawczenko*, 328 Ill. App. 3d 888, 897 (2002)).

¶ 46          In *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991), this court stated a trial court

may deny a defendant's request to proceed *pro se* when it comes "so late in the proceedings that

to grant it would be disruptive of the orderly schedule of proceedings." However, we cautioned that "when a request to proceed *pro se* is made and there is no request for additional time to prepare, a motion to proceed *pro se* should generally be viewed as timely as long as it is made before trial." *Id.*

¶ 47 Here, defendant did not request to proceed *pro se* until immediately before jury selection. See *People v. Starks*, 2024 IL App (4th) 230690-U, ¶ 44 (finding the defendant's request to proceed *pro se* was untimely when it was made after "the trial had essentially already begun, with potential jurors awaiting as *voir dire* was about to commence"). Although defendant's request was made before trial and he did not explicitly request a continuance, defendant's behavior indicates he wanted to delay the proceedings. Initially, before requesting to proceed *pro se*, defendant stated he wanted to hire private counsel on March 15, 2023, nearly 12 days before trial. Then, again on the day of trial, defendant indicated he wanted to hire private counsel but had not paid counsel yet. After this request to hire private counsel was denied, defendant attempted to file multiple *pro se* motions, which were rejected because he was represented by counsel. It was not until after this denial that defendant requested to proceed *pro se*. Moreover, when the trial court attempted to provide defendant with the required admonishments pursuant to Rule 401(a), defendant was uncooperative. The court directed defendant to answer its questions on multiple occasions and warned defendant if he failed to cooperate, he would not be able to represent himself. This behavior, coupled with the last-minute request to proceed *pro se*, makes it abundantly clear defendant was attempting to delay the proceedings. For these reasons, the court did not abuse its discretion in denying defendant's request to proceed *pro se*.

¶ 48 C. Constitutionality of UPWF Statute

¶ 49    "Statutes are presumed constitutional, and to rebut that presumption, the party challenging a statute's constitutionality has the burden of establishing a clear violation." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "The constitutionality of a statute is a question of law subject to *de novo* review." *People v. Gray*, 2017 IL 120958, ¶ 57.

¶ 50    Defendant challenges the constitutionality of the UPWF statute, both facially and as applied to him. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Bochenek*, 2021 IL 125889, ¶ 10. "If it is reasonably possible to construe the statute in a way that preserves its constitutionality, we must do so." *Id.* "[A]n 'as-applied' challenge protests against how a statute was applied in the particular context in which the challenging party acted or proposed to act." *Gray*, 2017 IL 120958, ¶ 58.

¶ 51    This court recently addressed the constitutionality of the UPWF statute in *People v. Burns*, 2024 IL App (4th) 230428. The defendant in *Burns* presented the same argument for finding the UPWF statute unconstitutional as defendant does in this case—namely, under the framework announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the State cannot establish the UPWF statute "is consistent with the United States's historical tradition of firearm regulation." *Burns*, 2024 IL App (4th) 230428, ¶ 16. We rejected the defendant's argument in *Burns*, holding *Bruen* did not apply to that defendant because *Bruen* only applied to law-abiding citizens, and based on his status as a felon, the defendant was not a law-abiding citizen. *Id.* ¶ 21. For that same reason, we reject defendant's argument regarding the facial constitutionality of the UPWF statute in this case.

¶ 52    In addition to the facial challenge to the UPWF statute, defendant argues the statute is unconstitutional as applied to him. This contention was also raised by the defendant in *Burns*. *Id.* ¶ 17. However, this court determined we could not address that defendant's as-applied

challenge because the defendant did not raise the issue in the trial court, and thus, there was not "a sufficiently developed evidentiary record upon which to analyze his argument." *Id.* In this case, the State argues we should not address defendant's as-applied challenge for the same reason given in *Burns*. In response, defendant contends this court has a sufficient record because (1) he stipulated he was previously convicted of a felony, (2) the presentence investigation report (PSI) showed he was previously convicted of aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1 (West 2016)), and (3) he was convicted of UPWF based on this previous felony conviction. While we agree with defendant the record demonstrates those three things, defendant fails to appreciate similar facts were present in *Burns*. In *Burns*, the defendant (1) stipulated to his prior felony conviction, (2) was previously convicted of aggravated unlawful use of a weapon, and (3) was convicted of UPWF based on that previous felony conviction. *Id.* ¶¶ 4-9. We found this information was insufficient to analyze the defendant's as-applied challenge. For the same reason, we find the record in this case to be insufficient to analyze defendant's as-applied challenge.

¶ 53                                     D. Sentencing

¶ 54          A trial court's sentence must be based on "the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. Additionally, the Unified Code of Corrections (730 ILCS 5/1-1-1 *et seq.* (West 2020)) sets forth the mitigating and aggravating factors the court must consider when determining an appropriate sentence. See *Id.* ¶ 105. However, "[t]he weight to be given to any proper factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis omitted.) *Id.* ¶ 104.

"A trial court's sentence is an abuse of discretion only if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Klein*, 2022 IL App (4th) 200599, ¶ 38. Moreover, "[a] sentence imposed within the statutory range provided by the legislature is presumed to be proper." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104.

¶ 55 Defendant contends his seven-year sentence was excessive, "considering [his] criminal history and positive work history." Defendant argues the trial court failed to properly consider his rehabilitative potential, positive work history, and family support when determining his sentence. We disagree.

¶ 56 Based on his conviction for UPWF, a Class 3 felony, defendant was subject to a sentencing range of 2 to 10 years' imprisonment. (720 ILCS 5/24-1.1(a), (e) (West 2020); 730 ILCS 5/5-4.5-40(a) (West 2020)). The trial court sentenced defendant to seven years, which is within the statutory range. When sentencing defendant, the court indicated it had reviewed the PSI, which described defendant's "positive work history" and family dynamic. The court then detailed the applicable aggravating and mitigating factors. It found defendant's criminal history, which included two felonies and multiple misdemeanors, especially aggravating. In mitigation, it found defendant had a solid education, did not intend to cause anyone harm, and defendant's actions did not cause any harm. Based on our review of the record, we find the court carefully considered the evidence from trial, the PSI, arguments of counsel, and the applicable aggravating and mitigating factors. There is nothing in the record to support defendant's contention the court abused its discretion in sentencing him to seven years' imprisonment.

¶ 57                                       III. CONCLUSION

¶ 58         For the reasons stated, we affirm the judgment of the trial court.

¶ 59         Affirmed.